John Robertelli, Esq.
Gene Y. Kang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Steven T. Henesy, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
21 Main Street, Suite 158
Court Plaza South, West Wing
Hackensack, New Jersey 07601
(201) 287-2460
john.robertelli@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., <br><br> Plaintiffs, <br><br> -against- <br><br> INTERSTATE MULTI-SPECIALTY MEDICAL GROUP, P.C., HIGHLAND MEDICAL GROUP, P.C., ALEXANDR ZAITSEV, M.D., ALLAN WEISSMAN, M.D., EUGENE GORMAN, M.D., ANTONIO CICCONE, D.O., RAYMOND REITER, M.D., MARCIA COPELAND, M.D., KEVIN LYNCH, D.C., and KURT R. LUNDBERG, D.C., <br><br> Defendants. | Index No.: <br><br><br><br><br><br><br><br><br> **COMPLAINT** <br><br> Plaintiffs Demand a Trial by Jury |

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

1.      This action seeks to recover more than $3,160,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges through Interstate Multi-Specialty Medical Group, P.C. ("Interstate") and Highland Medical Group, P.C. ("Highland") for purported initial examinations, follow-up examinations, computerized range of motion and muscle strength tests, electrodiagnostic testing, percutaneous neuromodulation therapy ("PNT") sessions, pain management injections, and anesthesia services (collectively the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not obligated to pay more than $75,000.00 in pending fraudulent claims seeking payment for the Fraudulent Services that the Defendants have submitted or caused to be submitted because:

(i)      the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no–fault insurance reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible for no–fault insurance reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre–determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

2

(iv)     in many cases, the Fraudulent Services never were provided in the first instance; and

(v)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.       The Defendants fall into the following categories:

(i)      Defendants Interstate and Highland are New Jersey medical professional corporations through which the Fraudulent Services purportedly were performed and billed to automobile insurance companies, including GEICO.

(ii)     Defendant Alexandr Zaitsev, M.D. ("Zaitsev") is a physician licensed to practice medicine in New Jersey. Zaitsev owned Interstate and Highland and purported to perform many of the Fraudulent Services.

(iii)    Defendants Allan Weissman, M.D. ("Weissman") Eugene Gorman, M.D. ("Gorman"), Antonio Ciccone, D.O. ("Ciccone"), Raymond Reiter, M.D. ("Reiter"), and Marcia Copeland, M.D. ("Copeland") are physicians licensed to practice medicine in New Jersey who purported to perform many of the Fraudulent Services billed through Interstate and Highland.

(iv)     Defendants Kevin Lynch, D.C. ("Lynch") and Kurt Lundberg, D.C. ("Lundberg") are chiropractors licensed to practice chiropractic in New Jersey who purported to perform many of the Fraudulent Services billed through Interstate.

5.       As discussed below, the Defendants at all relevant times have known that:

(i)      the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no–fault insurance reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible for no–fault insurance reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre–determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     in many cases, the Fraudulent Services never were provided in the first instance; and

(v)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.   As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Interstate and Highland.

7.   The charts annexed hereto as Exhibits "1" and "2" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

8.   The Defendants' fraudulent scheme began as early as 2012 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $3,160,000.00.

## THE PARTIES

### I.   Plaintiffs

9.   Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

### II.   Defendants

10.   Defendant Zaitsev resides in and is a citizen of New Jersey. Zaitsev was licensed to practice medicine in New Jersey in 2002, owned Interstate and Highland, and purported to perform many of the Fraudulent Services billed to GEICO through Interstate and Highland.

11.   Defendant Interstate is a New Jersey medical professional corporation with its place of business in Hackensack, New Jersey. Interstate was incorporated on or about August 27,

4

2013, was owned by Zaitsev, and was used by Zaitsev as a vehicle to submit fraudulent billing to GEICO and other insurers.

12.     Defendant Highland is a New Jersey medical professional corporation with its place of business in Hackensack, New Jersey. Highland was incorporated on or about May 26, 2010, was owned by Zaitsev, and was used by Zaitsev as a vehicle to submit fraudulent billing to GEICO and other insures.

13.     Defendant Weissman resides in and is a citizen of New Jersey. Weissman was licensed to practice medicine in New Jersey in 1998, and purported to perform many of the Fraudulent Services billed to GEICO through Interstate and Highland.

14.     Defendant Gorman resides in and is a citizen of New Jersey. Gorman was licensed to practice medicine in New Jersey in 1987, and purported to perform many of the Fraudulent Services billed to GEICO through Interstate and Highland.

15.     Defendant Ciccone resides in and is a citizen of New Jersey. Ciccone was licensed to practice medicine in New Jersey in 1992, and purported to perform many of the Fraudulent Services billed to GEICO through Interstate and Highland.

16.     Defendant Reiter resides in and is a citizen of New Jersey.  Reiter was licensed to practice medicine in New Jersey in 1990, and purported to perform many of the Fraudulent Services billed to GEICO through Interstate and Highland.

17.     In December 1999, Reiter was arrested on charges of sexual assault and criminal sexual conduct with four female patients, including one who was only 18 years old.

18.     Thereafter, Reiter was convicted in the Bergen County Superior Court of one count of sexual assault and four counts of criminal sexual conduct with respect to the patients.

19.     On May 31, 2001, the court rejected Reiter's request for probation, and instead

5

sentenced him to three years in prison, noting that Reiter's "rape of these women" was "violent in nature and antisocial."

20. During Reiter's sentencing proceedings, Bergen County Assistant Prosecutor Patricia Baglivi said Reiter picked on victims who were vulnerable and not likely to tell anyone about the assaults.

21. On February 22, 2002, retroactive to October 10, 2001, the New Jersey State Board of Medical Examiners (the "State Board") revoked Reiter's medical license as the result of his criminal conduct. Among other things, the State Board determined that Reiter had been convicted of crimes of moral turpitude, had engaged in gross and repeated acts of malpractice and professional misconduct, and was incapable of discharging the functions of a physician in a manner consistent with the public health, safety, and welfare.

22. On or about October 3, 2006, after he emerged from prison, Reiter asked the State Board to reinstate his medical license.

23. The State Board initially denied Reiter's request. Ultimately, however, on December 9, 2011, the State Board reinstated Reiter's license, but simultaneously imposed various restrictions on his license. A copy of the State Board's December 9, 2011 order is annexed hereto as Exhibit "3".

24. Specifically, the State Board imposed – among other things – the following restrictions on Reiter's reinstated medical license:

(i) Reiter was required to have a State Board–approved chaperone present whenever he was in the presence of a female patient, and the chaperone had to be a New Jersey–licensed registered nurse, licensed practical nurse, or physician assistant.

(ii) The chaperone was required to initial each female patient's chart to indicate the chaperone's presence for the entire duration of Reiter's contact with the female patient.

6

(iii)    Reiter was prohibited from working as a solo practitioner or as a partner in any medical practice, and instead was limited to working as an employee of someone else's medical practice or medical facility.

(iv)    Reiter was required to notify all future employers of the terms of the reinstatement order, including the chaperone requirements, and the employers were required to confirm to the State Board that they had received a copy of the reinstatement order and agreed to comply with its terms, including the chaperone requirements.

See Exhibit "3".

25.    Upon information and belief, Reiter's criminal history and history of professional discipline – which were widely reported and can be located by prospective employers through a simple internet search – have made it virtually impossible for Reiter to obtain legitimate employment as a physician, and made him amenable to participation in the Defendants' fraudulent scheme.

26.    Defendant Copeland resides in and is a citizen of New Jersey. Copeland was licensed to practice medicine in New Jersey in 1996, and purported to perform many of the Fraudulent Services billed to GEICO through Interstate.

27.    Defendant Lynch resides in and is a citizen of New Jersey. Lynch was licensed to practice chiropractic in New Jersey in 1995, and purported to provide many of the Fraudulent Services billed to GEICO through Interstate.

28.    Defendant Lundberg resides in and is a citizen of New Jersey. Lundberg was licensed to practice chiropractic in New Jersey in 1990, and purported to provide many of the Fraudulent Services billed to GEICO through Interstate.

29.    Lundberg has a history of professional misconduct that has resulted in discipline by the New Jersey Board of Chiropractic Examiners (the "Chiropractic Board") for his

participation in a fraudulent scheme that was strikingly similar to the type of scheme described in this Complaint.

30.     In a consent order dated December 30, 1996 (the "Consent Order"), the Chiropractic Board outlined its findings following an investigation into Lundberg's conduct as it related to a fraudulent chiropractic practice called Accident and Illness Center of Perth Amboy ("Accident and Illness Center"). A copy of the Consent Order is annexed hereto as Exhibit "4".

31.     Pursuant to the Consent Order, Lundberg admitted that:

(i)     Lundberg had practiced as an associate chiropractor at Accident and Illness Center of Perth Amboy;

(ii)    In this capacity, Lundberg had diagnosed and recommended treatment for his patients based not on the individual needs of the patients, but instead at the direction of the owners and operators of Accident and Illness Center;

(iii)   Lundberg had limited the time he took to conduct patient examinations to less than the amount of time that was legitimately required to perform the examinations;

(iv)    In the overwhelming majority of cases, Lundberg had diagnosed patients with disk wedging and disk displacement, despite the fact that the patients either did not have these conditions, or these conditions were of no clinical importance to the diagnosis of the patients;

(v)     Lundberg had fabricated the results of range of motion testing he performed on patients to create the appearance that the patients were more seriously injured than they actually were, in order to justify continuing treatment at Accident and Illness Center;

(vi)    Lundberg had aided and abetted in ordering diagnostic tests that were neither chiropractically nor medically necessary in the overwhelming majority of patients whom he purported to examine and treat;

(vii)   Lundberg created false patient records in order to create a false justification for continued treatment; and

(viii)  Lundberg falsely indicated in patient records that he had performed "neuromuscular reeducation" services on patients, when in fact he had performed no such services.

See Exhibit "4".

32.    Based on these admissions, among others, the Chiropractic Board found that Lundberg's conduct had constituted "dishonesty, fraud, deception, and misrepresentation…gross and repeated acts of negligence…[and] professional misconduct." See id.

33.    Based on these findings, the Chiropractic Board assessed Lundberg an $8,000.00 civil penalty, suspended Lundberg's license to practice chiropractic for six months, and declared that Lundberg's prospective chiropractic practice would be subject to ongoing monitoring and random audits of his patient records.

34.    Upon information and belief, Lundberg's public history of professional discipline – which can be located by prospective employers through a simple internet search – has made it virtually impossible for Lundberg to obtain legitimate employment as a chiropractor, and made him amenable to participation in the Defendants' fraudulent scheme.

**III.    Alexander Dimeo**

35.    Although not named as a Defendant in this action, Alexander Dimeo ("Dimeo") is relevant to understanding the Defendants' fraudulent scheme and the claims brought in this action.

36.    Dimeo resides in and is a citizen of New Jersey. Dimeo was licensed to practice chiropractic in New Jersey on or about November 1, 1977.

37.    In 2016, following the filing of criminal charges by the New Jersey Attorney General, Dimeo admitted his role in a fraudulent kickback scheme through which he was paid in excess of $250,000.00 in exchange for patient referrals.

38.     On or about May 20, 2016, in a case entitled <u>State of New Jersey v. Alexander Dimeo</u>, Docket Nos. 16-05-000251 and 16-05-000252, Dimeo pleaded guilty to the following offenses:

(i)     one count of second degree conspiracy to commit commercial bribery in violation of N.J.S.A. 2C:5-2 and N.J.S.A. 2C:21-10(a);

(ii)    one count of second degree money laundering in violation of <u>N.J.S.A.</u> 2C:21-25(b)(1);

(iii)   one count of second degree commercial bribery in violation of <u>N.J.S.A.</u> 2C:21-10(a)(3);

(iv)    three counts of third degree commercial bribery in violation of <u>N.J.S.A.</u> 2C:21-10(a); and

(v)     one count of third degree failure to pay taxes in violation of <u>N.J.S.A.</u> 54:52-9(a).

A copy of the transcript of Dimeo's plea hearing is annexed hereto as Exhibit "5".

39.     As part of his plea agreement, Dimeo provided sworn testimony regarding his receipt of kickbacks from various healthcare practitioners in New Jersey, including sworn testimony that Zaitsev had caused kickback payments to be made to him in exchange for patient referrals for electrodiagnostic testing. <u>See</u> Exhibit "5".

40.     Specifically, Dimeo testified that, beginning in 2012, Zaitsev directed an intermediary to provide between $150.00 to $250.00 per patient to Dimeo in exchange for patient referrals to Zaitsev and Highland. <u>See</u> <u>id</u>.

41.     All told, Dimeo testified that he accepted more than $37,000.00 in kickbacks from Zaitsev in exchange for patient referrals between 2012 and 2015. <u>See</u> <u>id</u>.

42.     As a result of his guilty pleas, Dimeo voluntarily surrendered his license to practice chiropractic in New Jersey, was ordered to pay an anti-money laundering Penalty of $250,000.00, and was sentenced to up to seven years in prison.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

44.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act)) because they arise under the laws of the United States.

45.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

46.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A.      The New Jersey No-Fault Laws

47.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

48.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed

assignment, a healthcare services provider may submit claims directly to an automobile insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

**B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice**

49.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

50.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice, whether or not the underlying services were medically necessary. See, e.g., Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 622 (N.J. 2017)(collecting cases); Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515-519 (App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620

(1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

51.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

52.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

53.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.     Pertinent New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

54.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

55.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a healthcare service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the healthcare service a fee directly or indirectly in connection with the referral, whether denominated as a referral or

prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

56.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

57.     Similarly, pursuant to N.J.A.C. 13:44E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

58.     Therefore, physicians, chiropractors, medical practices, and chiropractic practices that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

**D.     New Jersey Law Prohibiting Self-Referrals**

59.     In New Jersey, "practitioners" generally may not refer patients to a "healthcare service" in which they have a "significant beneficial interest". Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a healthcare service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest . . . .

60.     Pursuant to N.J.S.A. 45:9–22.4:

"Healthcare service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Healthcare service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home healthcare agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

61.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

62.     Pursuant to N.J.S.A. 45:9–22–5(c)(3), the Codey Law's restrictions on patient referrals also do not apply to referrals for certain procedures performed at an ambulatory care facility, such as an ambulatory surgery center, so long as certain conditions are met (the "ASC Exception").

63.     In particular, and as set forth in N.J.S.A. 45:9–22–5(c)(3), the Codey Law's restrictions do not apply to:

ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services, if the following conditions are met:

(a)     the practitioner who provided the referral personally performs the procedure;

(b)     the practitioner's remuneration as an owner of or investor in the practice or facility is directly proportional to the practitioner's ownership interest and not to the volume of patients the practitioner refers to the practice or facility;

(c)     all clinically–related decisions at a facility owned in part by non–practitioners are made by practitioners and are in the best interests of the patient; and

(d)     disclosure of the referring practitioner's significant beneficial interest in the practice or facility is made to the patient in writing, at or prior to the time that the referral is made, consistent with the provisions of section 3 of P.L. 1989, c. 19 (C.45:9–22.6).

64.     Thus, if a physician refers patients to a healthcare service she owns, or directs one of her employees to make such referrals, for procedures performed at an ambulatory surgical center that do not "require anesthesia," the referrals will not receive the benefit of the ASC Exception to the Codey Law.

65.     If a physician refers patients to an ambulatory care facility for "ambulatory surgery or procedures requiring anesthesia", the referrals will not qualify for the ASC Exception and therefore will violate the Codey Law unless – among other things – the physician who makes the referral personally performs the resulting procedure.

66.     Healthcare providers that operate in violation of the Codey Law are not eligible to receive PIP Benefits.

**E.      No-Fault Reimbursement and Medical Necessity**

67.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

68.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury:

> (1)     is not primarily for the convenience of the injured person or provider,
>
> (2)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization, and
>
> (3)     does not involve unnecessary diagnostic testing.

**F.      The Fee Schedule and Current Procedural Terminology Codes**

69.      New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

70.      The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

71.      When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

72.      The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.A.C. 11:3-29.6.

73.      The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant.

74.      Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

75.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3-29.4.

76.     With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

Artificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

77.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

78.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the procedure represents a 'separate procedure.' The inclusion of this statement indicates that the procedure, while possible to perform separately, is generally included in a more comprehensive procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

**G.     The New Jersey Insurance Fraud Prevention Act**

79.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act, ("IFPA") N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

80.     A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

81.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

82.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

83.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

## II.     **The Illegal Kickback Scheme**

84.     As set forth above, pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

85.     Zaitsev, Interstate, and Highland's ability to bill GEICO and other New Jersey automobile insurers for the Fraudulent Services depended on Interstate and Highland's ability to gain access to Insureds.

86.     Accordingly, upon information and belief, Zaitsev, Interstate, and Highland entered into a secret scheme with Dimeo whereby Zaitsev agreed to pay kickbacks to Dimeo in exchange for patient referrals to Interstate and Highland.

87.     The amount of kickbacks that Zaitsev and Highland paid to Dimeo was based on the volume of Insureds that Dimeo referred to Interstate and Highland.

88.     In exchange for kickbacks from Zaitsev, Interstate, and Highland, Dimeo routinely referred Insureds to Interstate and Highland for electrodiagnostic testing, regardless of the Insureds' individual symptoms, presentment, or – in most cases – the total absence of any medical problems arising from any automobile accident.

89.     For instance, during his May 20, 2016 plea allocution, Dimeo testified under oath that Zaitsev, through an intermediary, agreed to pay him between $150.00 and $250.00 per patient referral to Highland for electrodiagnostic testing. See Exhibit "5".

90.     As set forth above, Dimeo pleaded guilty to a various crimes and was sentenced to up to seven years in prison in connection with his illegal kickback relationships with various healthcare providers, including Zaitsev and Highland.

91.     The unlawful kickback relationships that Zaitsev, Interstate, and Highland established with Dimeo were essential to the success of the Defendants' fraudulent scheme.

92.     Zaitsev, Interstate, and Highland derived significant financial benefit from the relationships because without the access to the Insureds provided by Dimeo they would not have had the ability to bill automobile insurers, including GEICO, or generate income from insurance claim payments.

93.     Because Zaitsev, Interstate, and Highland – at all relevant times – paid illegal kickbacks in exchange for patient referrals, they never were eligible to collect PIP Benefits from GEICO and other insurers.

94.     Even so, in each of the claims identified in Exhibits "1" and "2", Zaitsev, Interstate, and Highland falsely represented that Interstate and Highland were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits, when in fact they were not.

95.     What is more, in each of the claims identified in Exhibits "1" and "2", Zaitsev, Interstate, and Highland fraudulently concealed the fact that they paid kickbacks in exchange for patient referrals, thereby rendering Interstate and Highland ineligible for PIP reimbursement.

### III.     The Defendants' Fraudulent Treatment and Billing Protocol

96.     Virtually all of the Insureds in the claims identified in Exhibits "1" and "2" whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

97.     Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the minor accidents they experienced or purported to experience.

98.     Even so, the Defendants purported to subject virtually every Insured to a virtually identical and medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit through Interstate and Highland to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

99.     The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in many cases – the total absence of any actual medical problems arising from any actual automobile accidents.

100.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

101.    No legitimate physician, chiropractor, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices, nor would any legitimate physician, chiropractor, or other healthcare services provider refer a patient for the fraudulent treatment protocol described below.

102.    The Defendants permitted the fraudulent treatment protocol described below to proceed under their auspices because they sought to continue profiting from the fraudulent scheme and, in the case of Reiter and Lundberg, because their professional disciplinary records and/or criminal histories made them ineligible for legitimate professional employment.

**A.      The Fraudulent Charges for Initial Examinations at Interstate and Highland**

103.    As an initial step in the Defendants' fraudulent treatment and billing protocol, and pursuant to the illegal kickbacks that Zaitsev, Interstate, and Highland paid for their patient referrals, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland purported to provide virtually every Insured with an initial examination.

104.     The initial examinations essentially were performed as a "gateway" in order to provide Insureds with pre-determined and phony "diagnoses" to allow the Defendants to then provide the laundry list of Fraudulent Services.

105.     Zaitsev, Weissman, Ciccone, Gorman, or Reiter purported to perform the majority of the putative initial examinations at Interstate and Highland, which were then billed to GEICO under CPT codes 99203, 99204, 99243, or 99244, typically resulting in charges of between $139.56 and $425.00 for each purported initial examination.

106.     In the claims for initial examinations identified in Exhibits "1" and "2", the charges for the initial examinations were fraudulent in that they misrepresented Interstate and Highland's eligibility to collect PIP Benefits in the first instance.

107.     In fact, Interstate and Highland never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither they nor the examinations were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1.       Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

108.     Moreover, in the claims for initial examinations under CPT codes 99203, 99204, 99243, and 99244 that are identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely misrepresented the severity of the Insureds' presenting problems.

109.     Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT codes 99244 and 99204 to bill for an initial patient examination typically requires that the Insured present with problems of moderate to high severity.

110.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99244 and 99204 to bill for an initial patient examination.

111.    For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99244 to bill for an initial patient examination:

(i)     Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (MC and Rectal Surgery)

(ii)    Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)   Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux.

112.    Similarly, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT codes 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

24

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

113.   Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99244 and 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

114.   Pursuant to the CPT Assistant, the use of CPT codes 99243 and 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

115.   The CPT Assistant also provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT codes 99243 and 99203 to bill for an initial patient examination.

116.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99243 to bill for an initial patient examination:

(i)   Initial office consultation for a 65-year-old female with persistent bronchitis. (Infectious Disease)

(ii)   Initial office consultation for a 65-year-old man with chronic low-back pain radiating to the leg. (Neurosurgery)

117.   Likewise, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)   Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)   Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

118.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT codes 99243 and 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

119.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

120.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1" and "2" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the substantial majority of the claims identified in Exhibits "1" and "2" the Insureds did not seek treatment at any hospital as the result of their accidents.

121.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

122.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were

26

drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

123.    To the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" experienced any injuries at all as the result of their generally-trivial automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

124.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate at regular intervals why continued treatment is necessary beyond the four-week mark.

125.    Even so, in the claims for initial examinations identified in Exhibits "1", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely billed for their putative initial examinations using CPT codes 99203, 99204, 99243, and 99244, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity, often weeks or even many months after the underlying accidents.

126.    For example:

(i)     On October 1, 2012, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and did not complain of any pain at the scene. In keeping with the fact that SP was not injured, she did not visit any hospital following the accident. To the extent that SP experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within seven months of the accident. Even so, following a purported initial examination of SP on May 7, 2013 – seven months after the minor accident – Zaitsev and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that SP presented with problems of moderate to high severity.

(ii)    On October 4, 2012, an Insured named SH was involved in a minor automobile accident. In keeping with the fact that SH was not injured, she did not visit any hospital following the accident. To the extent that SH experienced any health

problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within six months of the accident. Even so, following a purported initial examination of SH on February 13, 2013, Ciccone, Zaitsev, and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that SH presented with problems of moderate to high severity. Then, following a second, duplicative initial examination on April 3, 2013 – six months after the minor accident – Weissman, Zaitsev, and Highland again billed GEICO for the duplicative initial examination using CPT code 99244, thereby falsely representing that SH again had presented with problems of moderate to high severity.

(iii)     On December 14, 2012, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain at the scene. In keeping with the fact that IF was not injured, he did not visit any hospital following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, following a purported initial examination of IF on April 12, 2013 – five months after the minor accident – Weissman, Zaitsev, and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that IF had presented with problems of moderate to high severity.

(iv)     On November 4, 2012, an Insured named WF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WF's vehicle was drivable following the accident. The police report further indicated that WF was not injured and did not complain of any pain at the scene. In keeping with the fact that WF was not injured, he did not visit any hospital following the accident. To the extent that WF experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of WF on March 25, 2013, Reiter, Zaitsev, and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that WF presented with problems of moderate to high severity.

(v)     On March 5, 2013, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured and did not complain of any pain at the scene. In keeping with the fact that MJ was not injured, she did not visit any hospital following the accident. To the extent that MJ experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of MJ on June 27, 2013, Gorman, Zaitsev, and Interstate billed GEICO for the initial examination

using CPT code 99244, thereby falsely representing that MJ presented with problems of moderate to high severity.

(vi)     On March 5, 2013, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not injured, she did not visit any hospital following the accident. To the extent that MC experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of MC on June 27, 2013, Gorman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that MC presented with problems of moderate to high severity.

(vii)    On March 5, 2013, an Insured named EV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EV's vehicle was drivable following the accident. The police report further indicated that EV was not injured and did not complain of any pain at the scene. In keeping with the fact that EV was not injured, he did not visit any hospital following the accident. To the extent that EV experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of EV on June 27, 2013, Gorman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that EV presented with problems of moderate to high severity.

(viii)   On March 26, 2013, an Insured named GT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GT's vehicle was drivable following the accident. The police report further indicated that GT was not injured and did not complain of any pain at the scene. In keeping with the fact that GT was not injured, she did not visit any hospital following the accident. To the extent that GT experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of GT on August 13, 2013, Zaitsev and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that GT presented with problems of moderate to high severity. Then, following a second, duplicative initial examination on October 4, 2013 – more than six months after the minor accident – Ciccone, Zaitsev, and Highland again billed GEICO for the duplicative initial examination using CPT code 99244, thereby falsely representing that GT again presented with problems of moderate to high severity.

(ix)     On July 2, 2013, an Insured named SW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SW's vehicle was drivable following the accident.

The police report further indicated that SW was not injured and did not complain of any pain at the scene. In keeping with the fact that SW was not injured, she did not visit any hospital following the accident. To the extent that SW experienced any health problems at all as the result of the minor accident, they were of low severity, and had completely resolved within three months of the accident. Even so, following a purported initial examination of SW on October 10, 2013, Zaitsev, Weissman, and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that SW presented with problems of moderate to high severity. Then, following a second, duplicative initial examination on November 13, 2013 – more than four months after the minor accident – Gorman, Zaitsev, and Highland again billed GEICO for the duplicative initial examination using CPT code 99244, thereby falsely representing that SW again presented with problems of moderate to high severity.

(x)     On October 14, 2013, an Insured named ML was involved in a minor automobile accident. In keeping with the fact that ML was not injured, she did not visit any hospital following the accident. To the extent that ML experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of ML on January 9, 2014, Weissman, Zaitsev, and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that ML presented with problems of moderate to high severity. Then, following a second, duplicative initial examination on April 24, 2014 – more than six months after the minor accident – Gorman, Zaitsev, and Interstate billed GEICO for the duplicative initial examination using CPT code 99244, thereby falsely representing that ML presented with problems of moderate to high severity.

(xi)    On October 14, 2013, an Insured named JB was involved in a minor automobile accident. In keeping with the fact that JB was not injured, he did not visit any hospital following the accident. To the extent that JB experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of JB on January 9, 2014, Weissman, Zaitsev, and Highland billed GEICO for the initial examination using CPT code 99244, thereby falsely representing that JB presented with problems of moderate to high severity.

(xii)   On September 22, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within two months of the minor accident. Even so, following a purported initial examination of JR on January 4, 2016 – more than three months after the minor accident – Weissman, Zaitsev, and Interstate billed GEICO for the initial

examination using CPT code 99243, thereby falsely representing that JR presented with problems of moderate severity.

(xiii)   On November 29, 2015, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that AG was not injured and did not complain of any pain at the scene. Later that same day, AG traveled on his own to Hackensack University Medical Center. The contemporaneous hospital records indicated that AG was observed on an outpatient and discharged that same day with a routine muscle strain diagnosis. To the extent that AG experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of AG on February 15, 2016, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that AG presented with problems of moderate severity.

(xiv)   On January 11, 2016, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not injured, he did not visit any hospital following the accident. To the extent that CR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of CR on April 26, 2016, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that CR presented with problems of moderate severity.

(xv)   On January 11, 2016, an Insured named FC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FC's vehicle was drivable following the accident. The police report further indicated that FC was not injured and did not complain of any pain at the scene. In keeping with the fact that FC was not injured, he did not visit any hospital following the accident. To the extent that FC experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of FC on April 26, 2016, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that FC presented with problems of moderate severity.

(xvi)   On January 11, 2016, an Insured named NS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NS's vehicle was drivable following the accident. The police report further indicated that NS was not injured and did not complain of any pain at the scene. In keeping with the fact that NS was not injured, she did not visit any hospital following the accident. To the extent that

NS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of NS on April 26, 2016, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that NS presented with problems of moderate severity.

(xvii)   On January 11, 2016, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not injured, she did not visit any hospital following the accident. To the extent that AV experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of AV on May 24, 2016, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that AV presented with problems of moderate severity.

(xviii)  On December 10, 2016, an Insured named AB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AB's vehicle was drivable following the accident. The police report further indicated that AB was not injured and did not complain of any pain at the scene. In keeping with the fact that AB was not injured, he did not visit any hospital following the accident. To the extent that AB experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of AB on March 8, 2017, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99204, thereby falsely representing that AB presented with problems of moderate to high severity.

(xix)    On January 11, 2016, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that LS was not injured and did not complain of any pain at the scene. In keeping with the fact that LS was not injured, he did not visit any hospital following the accident. To the extent that LS experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of LS on March 8, 2017, Ciccone, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99203, thereby falsely representing that LS presented with problems of moderate severity.

(xx)     On January 11, 2016, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JO was not injured and did not complain of any pain at the scene. In keeping with the fact that JO was not injured, she did not visit any hospital following the accident. To

the extent that JO experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of JO on March 8, 2017, Ciccone, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99203, thereby falsely representing that JO presented with problems of moderate severity.

(xxi)    On January 28, 2016, an Insured named FP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that FP was not injured and did not complain of any pain at the scene. In keeping with the fact that FP was not injured, he did not visit any hospital following the accident. To the extent that FP experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of FP on May 13, 2016 – nearly four months after the minor accident – Gorman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that FP presented with problems of moderate severity.

(xxii)   On March 20, 2016, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured and did not complain of any pain at the scene. In keeping with the fact that JA was not injured, he did not visit any hospital following the accident. To the extent that JA experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of JA on April 11, 2016, Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that JA presented with problems of moderate severity.

(xxiii)  On September 24, 2016, an Insured named HR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured and did not complain of any pain at the scene. In keeping with the fact that HR was not injured, he did not visit any hospital following the accident. To the extent that HR experienced any health problems at all as the result of the minor accident, they were of low severity. Even so, following a purported initial examination of HR on February 2, 2017 – more than four months after the minor accident - Weissman, Zaitsev, and Interstate billed GEICO for the initial examination using CPT code 99243, thereby falsely representing that HR presented with problems of moderate severity.

127.    These are only representative examples. In all of the claims for initial examinations identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter,

Interstate, and Highland falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

128.    In the claims for initial examinations identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203, 99204, 99243, and 99244, because examinations billable under CPT codes 99203, 99204, 99243, and 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

129.    In the claims for initial examinations identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, computerized range of motion and muscle strength tests, electrodiagnostic testing, PNT sessions, pain management injections, and anesthesia services

## 2.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations

130.    Pursuant to the Fee Schedule, the use of CPT code 99244 typically requires that a physician spend 60 minutes of face-to-face time with the Insured or the Insured's family.

131.    Pursuant to the Fee Schedule, the use of CPT code 99204 typically requires that a physician spend 45 minutes of face-to-face time with the Insured or the Insured's family.

132.    Pursuant to the Fee Schedule, the use of CPT 99243 typically requires that a physician spend 40 minutes of face-to-face time with the Insured or the Insured's family.

133.    Pursuant to the Fee Schedule, the use of CPT 99203 typically requires that a physician spend 30 minutes of face-to-face time with the Insured or the Insured's family.

134.    Though Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland billed for their putative initial examinations under CPT code 99244, 99243, 99204, or 99203, no physician or other healthcare professional associated with Interstate and Highland ever spent 30 minutes on the initial examinations in the claims identified in Exhibits "1" and "2", much less 40, 45, or 60 minutes. Rather, the initial examinations almost never lasted more than 10-15 minutes, to the extent that they were conducted at all.

135.    In keeping with the fact that the initial examinations almost never lasted more than 10-15 minutes – to the extent that they were conducted at all – Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland used template forms in conducting the initial examinations.

136.    The template forms that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland used in conducting the initial examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

137.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds.

138.    These interviews and examinations did not require Zaitsev, Weissman, Ciccone, Gorman, Reiter, or any other physician associated with Interstate to spend more than 10-15

minutes of face-to-face time with the Insureds or their families during the putative initial examinations.

139. In the claims for initial examinations identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that the putative examinations involved between 30 and 60 minutes of face-to-face time with the Insureds or their families, because examinations that entail between 30 and 60 minutes of face-to-face time with the patients or their families are reimbursable at higher rates than examinations that require less time to perform.

### 3. Misrepresentations Regarding "Comprehensive" Physical Examinations

140. Pursuant to the Fee Schedule, the use of CPT codes 99244 or 99204 to bill for a patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

141. Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

142. Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

143. The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (<u>e.g.</u>, fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)    respiratory;

(vi)    gastrointestinal;

(vii)    genitourinary;

(viii)    musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)    neurological;

(xi)    psychiatric;

(xii)    endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)    allergic/immunologic.

144.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper

extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

145.   In the claims identified in Exhibits "1" and "2", when Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland billed for the initial examinations under CPT codes 99244 and 99204, they falsely represented that they performed "comprehensive" patient examinations of the Insureds they purported to treat during the initial examinations.

146.   In fact, with respect to the claims identified in Exhibits "1" and "2", neither Zaitsev, Weissman, Ciccone, Gorman, Reiter, nor any other treating provider associated with Interstate or Highland, ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

147.   For instance, in each of the claims for initial examinations identified in Exhibits "1" and "2", neither Zaitsev, Weissman, Ciccone, Gorman, Reiter, nor any other treating provider associated with Interstate or Highland, conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

148.   Furthermore, although Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland often purported to provide a more in–depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "1" and "2",

the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café–au–lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

149.    For example:

(i)     On or about January 16, 2013, Ciccone, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Ciccone purported to perform on an Insured named EL, and thereby represented that they had provided a "comprehensive" physical examination to EL. However, Ciccone did not document findings with respect to at least eight of EL's organ systems, nor did he document a "complete" examination of EL's musculoskeletal system or any of EL's other organ systems.

(ii)    On or about March 11, 2013, Reiter, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Reiter purported to perform on an Insured named AL, and thereby represented that they had provided a

"comprehensive" physical examination to AL. However, Reiter did not document findings with respect to at least eight of AL's organ systems, nor did he document a "complete" examination of AL's musculoskeletal system or any of AL's other organ systems.

(iii)    On or about May 6, 2013, Reiter, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Reiter purported to perform on an Insured named GC, and thereby represented that they had provided a "comprehensive" physical examination to GC. However, Reiter did not document findings with respect to at least eight of GC's organ systems, nor did he document a "complete" examination of GC's musculoskeletal system or any of GC's other organ systems.

(iv)    On or about June 3, 2013, Gorman, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Gorman purported to perform on an Insured named BG, and thereby represented that they had provided a "comprehensive" physical examination to BG. However, Gorman did not document findings with respect to at least eight of BG's organ systems, nor did he document a "complete" examination of BG's musculoskeletal system or any of BG's other organ systems.

(v)    On or about August 29, 2013, Ciccone, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Ciccone purported to perform on an Insured named AA, and thereby represented that they had provided a "comprehensive" physical examination to AA. However, Ciccone did not document findings with respect to at least eight of AA's organ systems, nor did he document a "complete" examination of AA's musculoskeletal system or any of AA's other organ systems.

(vi)    On or about October 31, 2013, Reiter, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Reiter purported to perform on an Insured named YG, and thereby represented that they had provided a "comprehensive" physical examination to YG. However, Reiter did not document findings with respect to at least eight of YG's organ systems, nor did he document a "complete" examination of YG's musculoskeletal system or any of YG's other organ systems.

(vii)    On or about January 17, 2014, Gorman, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Gorman purported to perform on an Insured named BL, and thereby represented that they had provided a "comprehensive" physical examination to BL. However, Gorman did not document findings with respect to at least eight of BL's organ systems, nor did he document a "complete" examination of BL's musculoskeletal system or any of BL's other organ systems.

(viii)    On or about February 10, 2014, Reiter, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Reiter purported to perform on an Insured named MD, and thereby represented that they had provided a "comprehensive" physical examination to MD. However, Reiter did not document findings with respect to at least eight of MD's organ systems, nor did he document a "complete" examination of MD's musculoskeletal system or any of MD's other organ systems.

(ix)     On or about February 18, 2014, Gorman, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Gorman purported to perform on an Insured named RR, and thereby represented that they had provided a "comprehensive" physical examination to RR. However, Gorman did not document findings with respect to at least eight of RR's organ systems, nor did he document a "complete" examination of RR's musculoskeletal system or any of RR's other organ systems.

(x)      On or about February 20, 2014, Ciccone, Zaitsev, and Highland billed GEICO under CPT code 99244 for an initial examination that Ciccone purported to perform on an Insured named GG, and thereby represented that they had provided a "comprehensive" physical examination to GG. However, Ciccone did not document findings with respect to at least eight of GG's organ systems, nor did he document a "complete" examination of GG's musculoskeletal system or any of GG's other organ systems.

(xi)     On or about February 27, 2014, Ciccone, Zaitsev, and Interstate billed GEICO under CPT code 99244 for an initial examination that Ciccone purported to perform on an Insured named MR, and thereby represented that they had provided a "comprehensive" physical examination to MR. However, Ciccone did not document findings with respect to at least eight of MR's organ systems, nor did he document a "complete" examination of MR's musculoskeletal system or any of MR's other organ systems.

(xii)    On or about March 18, 2014, Weissman, Zaitsev, and Interstate billed GEICO under CPT code 99244 for an initial examination that Weissman purported to perform on an Insured named TH, and thereby represented that they had provided a "comprehensive" physical examination to TH. However, Weissman did not document findings with respect to at least eight of TH's organ systems, nor did he document a "complete" examination of TH's musculoskeletal system or any of TH's other organ systems.

(xiii)   On or about April 25, 2014, Gorman, Zaitsev, and Interstate billed GEICO under CPT code 99244 for an initial examination that Gorman purported to perform on an Insured named VF, and thereby represented that they had provided a "comprehensive" physical examination to VF. However, Gorman did not document findings with respect to at least eight of VF's organ systems, nor did he

document a "complete" examination of VF's musculoskeletal system or any of VF's other organ systems.

(xiv)   On or about December 9, 2014, Gorman, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Gorman purported to perform on an Insured named ED, and thereby represented that they had provided a "comprehensive" physical examination to ED. However, Gorman did not document findings with respect to at least eight of ED's organ systems, nor did he document a "complete" examination of ED's musculoskeletal system or any of ED's other organ systems.

(xv)   On or about February 3, 2015, Weissman, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Weissman purported to perform on an Insured named VK, and thereby represented that they had provided a "comprehensive" physical examination to VK. However, Weissman did not document findings with respect to at least eight of VK's organ systems, nor did he document a "complete" examination of VK's musculoskeletal system or any of VK's other organ systems.

(xvi)   On or about March 30, 2015, Gorman, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Gorman purported to perform on an Insured named NV, and thereby represented that they had provided a "comprehensive" physical examination to NV. However, Gorman did not document findings with respect to at least eight of NV's organ systems, nor did he document a "complete" examination of NV's musculoskeletal system or any of NV's other organ systems.

(xvii)   On or about August 13, 2015, Gorman, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Gorman purported to perform on an Insured named JT, and thereby represented that they had provided a "comprehensive" physical examination to JT. However, Gorman did not document findings with respect to at least eight of JT's organ systems, nor did he document a "complete" examination of JT's musculoskeletal system or any of JT's other organ systems.

(xviii)   On or about December 21, 2015, Ciccone, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Ciccone purported to perform on an Insured named JO, and thereby represented that they had provided a "comprehensive" physical examination to JO. However, Ciccone did not document findings with respect to at least eight of JO's organ systems, nor did he document a "complete" examination of JO's musculoskeletal system or any of JO's other organ systems.

(xix)   On or about January 26, 2016, Weissman, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Weissman purported to perform on an Insured named BA, and thereby represented that they had provided

a "comprehensive" physical examination to BA. However, Weissman did not document findings with respect to at least eight of BA's organ systems, nor did he document a "complete" examination of BA's musculoskeletal system or any of BA's other organ systems.

(xx)   On or about March 10, 2016, Gorman, Zaitsev, and Interstate billed GEICO under CPT code 99204 for an initial examination that Gorman purported to perform on an Insured named RJ, and thereby represented that they had provided a "comprehensive" physical examination to RJ. However, Gorman did not document findings with respect to at least eight of RJ's organ systems, nor did he document a "complete" examination of RJ's musculoskeletal system or any of RJ's other organ systems.

150.   These are only representative examples. In the claims for initial examinations under CPT codes 99244 and 99204 that are identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland virtually always falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99244 and 99204, because examinations billable under CPT codes 99244 and 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "detailed" physical examinations.

**4.   Misrepresentations Regarding the Extent of Medical Decision-Making**

151.   Furthermore, pursuant to the Fee Schedule, the use of CPT codes 99244 or 99204 to bill for a patient examination represents that the physician who performed the examination engaged in medical decision–making of "moderate complexity".

152.   Pursuant to the Fee Schedule, the use of CPT codes 99243 or 99203 to bill for a patient examination represents that the physician who performed the examination engaged in medical decision–making of "low complexity".

153.   Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the complexity of medical decision–making is

measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

154.    Though Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" (when billed under CPT codes 99244 or 99204) or "low complexity" (when billed under CPT codes 99243 or 99203), in actuality the initial examinations did not involve any medical decision-making at all.

155.    First, in virtually every case, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland for treatment, they did not arrive with any medical records except, at times, basic radiology studies. Furthermore, prior to the initial examinations, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland neither requested any medical records from any other healthcare providers, nor conducted any diagnostic tests.

156.    Second, in virtually every case, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

157.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland, to the extent that Zaitsev, Weissman,

Ciccone, Gorman, Reiter, Interstate, and Highland provided any such diagnostic procedures or treatment options in the first instance.

158.    In almost every instance, any diagnostic procedures and "treatments" that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which was health- or life-threatening if properly administered.

159.    Third, in virtually every case, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

160.    Rather, to the extent that the initial examinations were conducted in the first instance, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

161.    Specifically, in almost every instance, during the initial examinations the Insureds did not report any medical problems that legitimately could be traced to an underlying automobile accident.

162.    Even so, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland prepared initial examination reports in which they provided phony, boilerplate cervical sprain/strain, lumbar sprain/strain, disc bulge/herniation, radiculopathy, and related "diagnoses" to virtually every Insured, regardless of their individual circumstances or presentment.

163.    Then, based upon these supposed "diagnoses", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland directed virtually every Insured to return to Interstate

for medically unnecessary follow-up examinations, chiropractic services, diagnostic testing, and interventional pain management services.

For example:

(i)     On October 1, 2012, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and did not complain of any pain at the scene. In keeping with the fact that SP was not injured, she did not visit any hospital following the accident. To the extent that SP experienced any health problems at all as the result of the minor accident, they were of low severity. On May 7, 2013, Zaitsev purported to conduct an initial examination of SP at Highland. Zaitsev did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zaitsev did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zaitsev provided SP with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither SP's presenting problems, nor the treatment plan provided to SP by Zaitsev and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, SP did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Zaitsev and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to SP. Even so, Zaitsev and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Zaitsev engaged in some legitimate medical decision-making during the purported examination.

(ii)    On October 4, 2012, an Insured named SH was involved in a minor automobile accident. In keeping with the fact that SH was not injured, she did not visit any hospital following the accident. To the extent that SH experienced any health problems at all as the result of the minor accident, they were of low severity. On April 3, 2013, Weissman purported to conduct an initial examination of SH at Highland. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided SH with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither SH's presenting problems, nor the treatment plan provided to SH by Zaitsev, Weissman, and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, SH did not need any treatment at all as the result of her minor accident, and the treatment plan

provided by Zaitsev, Weissman, and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to SH. Even so, Zaitsev, Weissman, and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(iii)    On November 4, 2012, an Insured named WF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WF's vehicle was drivable following the accident. The police report further indicated that WF was not injured and did not complain of any pain at the scene. In keeping with the fact that WF was not injured, he did not visit any hospital following the accident. To the extent that WF experienced any health problems at all as the result of the minor accident, they were of low severity. On March 25, 2013, Reiter purported to conduct an initial examination of WF at Highland. Reiter did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Reiter did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Reiter provided WF with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither WF's presenting problems, nor the treatment plan provided to WF by Zaitsev, Reiter, and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, WF did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Reiter, and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to WF. Even so, Zaitsev, Reiter, and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Reiter engaged in some legitimate medical decision-making during the purported examination.

(iv)    On December 14, 2012, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain at the scene. In keeping with the fact that IF was not injured, he did not visit any hospital following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity. On April 12, 2013, Weissman purported to conduct an initial examination of IF at Highland. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided IF with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to

virtually every other Insured. Furthermore, neither IF's presenting problems, nor the treatment plan provided to IF by Zaitsev, Weissman, and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, IF did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Weissman, and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to IF. Even so, Zaitsev, Weissman, and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(v)     On March 26, 2013, an Insured named GT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GT's vehicle was drivable following the accident. The police report further indicated that GT was not injured and did not complain of any pain at the scene. In keeping with the fact that GT was not injured, she did not visit any hospital following the accident. To the extent that GT experienced any health problems at all as the result of the minor accident, they were of low severity. On August 13, 2013, Zaitsev purported to conduct an initial examination of GT at Highland. Zaitsev did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Zaitsev did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Zaitsev provided GT with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither GT's presenting problems, nor the treatment plan provided to GT by Zaitsev and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, GT did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Zaitsev and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to GT. Even so, Zaitsev and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Zaitsev engaged in some legitimate medical decision-making during the purported examination.

(vi)    On July 2, 2013, an Insured named SW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SW's vehicle was drivable following the accident. The police report further indicated that SW was not injured and did not complain of any pain at the scene. In keeping with the fact that SW was not injured, she did not visit any hospital following the accident. To the extent that SW experienced any health problems at all as the result of the minor accident, they were of low severity. On October 10, 2013, Gorman purported to conduct an initial examination of SW at Highland. Gorman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in

connection with the examination. Moreover, Gorman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gorman provided SW with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither SW's presenting problems, nor the treatment plan provided to SW by Zaitsev, Gorman, and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, SW did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Gorman, and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to SW. Even so, Zaitsev, Gorman, and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Gorman engaged in some legitimate medical decision-making during the purported examination.

(vii)     On October 14, 2013, an Insured named JB was involved in a minor automobile accident. In keeping with the fact that JB was not injured, he did not visit any hospital following the accident. To the extent that JB experienced any health problems at all as the result of the minor accident, they were of low severity. On January 9, 2014, Weissman purported to conduct an initial examination of JB at Highland. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided JB with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JB's presenting problems, nor the treatment plan provided to JB by Zaitsev, Weissman, and Highland, presented any risk of significant complications, morbidity, or mortality. To the contrary, JB did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Weissman, and Highland consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to JB. Even so, Zaitsev, Weissman, and Highland billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(viii)    On April 22, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity. On January 4, 2016, Weissman purported to conduct an initial examination of JR at Interstate. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other

information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided JR with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Zaitsev, Weissman, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Weissman, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to JR. Even so, Zaitsev, Weissman, and Interstate billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(ix)     On January 11, 2016, an Insured named LS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that LS was not injured and did not complain of any pain at the scene. In keeping with the fact that LS was not injured, he did not visit any hospital following the accident. To the extent that LS experienced any health problems at all as the result of the minor accident, they were of low severity. On March 8, 2017, Ciccone purported to conduct an initial examination of LS at Interstate. Ciccone did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ciccone did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ciccone provided LS with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither LS's presenting problems, nor the treatment plan provided to LS by Zaitsev, Ciccone, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, LS did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Ciccone, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to LS. Even so, Zaitsev, Ciccone, and Interstate billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ciccone engaged in some legitimate medical decision-making during the purported examination.

(x)     On January 11, 2016, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not injured, she did not visit any hospital following the accident. To the extent that AV experienced any health problems at all as the result of the minor accident,

they were of low severity. On May 24, 2016, Weissman purported to conduct an initial examination of AV at Interstate. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided AV with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither AV's presenting problems, nor the treatment plan provided to AV by Zaitsev, Weissman, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, AV did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Zaitsev, Weissman, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to AV. Even so, Zaitsev, Weissman, and Interstate billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(xi)     On January 11, 2016, an Insured named NS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NS's vehicle was drivable following the accident. The police report further indicated that NS was not injured and did not complain of any pain at the scene. In keeping with the fact that NS was not injured, she did not visit any hospital following the accident. To the extent that NS experienced any health problems at all as the result of the minor accident, they were of low severity. On May 24, 2016, Weissman purported to conduct an initial examination of NS at Interstate. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided NS with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither NS's presenting problems, nor the treatment plan provided to NS by Zaitsev, Weissman, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, NS did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Zaitsev, Weissman, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to NS. Even so, Zaitsev, Weissman, and Interstate billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(xii)    On January 11, 2016, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JO was

not injured and did not complain of any pain at the scene. In keeping with the fact that JO was not injured, she did not visit any hospital following the accident. To the extent that JO experienced any health problems at all as the result of the minor accident, they were of low severity. On March 8, 2017, Ciccone purported to conduct an initial examination of JO at Interstate. Ciccone did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Ciccone did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Ciccone provided JO with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither JO's presenting problems, nor the treatment plan provided to JO by Zaitsev, Ciccone, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, JO did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Zaitsev, Ciccone, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to JO. Even so, Zaitsev, Ciccone, and Interstate billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Ciccone engaged in some legitimate medical decision-making during the purported examination.

(xiii)   On January 28, 2016, an Insured named FP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that FP was not injured and did not complain of any pain at the scene. In keeping with the fact that FP was not injured, he did not visit any hospital following the accident. To the extent that FP experienced any health problems at all as the result of the minor accident, they were of low severity. On May 13, 2016, Gorman purported to conduct an initial examination of FP at Interstate. Gorman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Gorman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Gorman provided FP with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither FP's presenting problems, nor the treatment plan provided to FP by Zaitsev, Gorman, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, FP did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Gorman, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to FP. Even so, Zaitsev, Gorman, and Interstate billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that Gorman engaged in some legitimate medical decision-making during the purported examination.

(xiv)   On September 24, 2016, an Insured named HR was involved in an automobile

accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HR's vehicle was drivable following the accident. The police report further indicated that HR was not injured and did not complain of any pain at the scene. In keeping with the fact that HR was not injured, he did not visit any hospital following the accident. To the extent that HR experienced any health problems at all as the result of the minor accident, they were of low severity. On February 2, 2017, Weissman purported to conduct an initial examination of HR at Interstate. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided HR with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither HR's presenting problems, nor the treatment plan provided to HR by Zaitsev, Weissman, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, HR did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Weissman, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to HR. Even so, Zaitsev, Weissman, and Interstate billed GEICO for the initial examination using CPT code 99243, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

(xv)     On December 10, 2016, an Insured named AB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AB's vehicle was drivable following the accident. The police report further indicated that AB was not injured and did not complain of any pain at the scene. In keeping with the fact that AB was not injured, he did not visit any hospital following the accident. To the extent that AB experienced any health problems at all as the result of the minor accident, they were of low severity. On March 8, 2017, Weissman purported to conduct an initial examination of AB at Interstate. Weissman did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Weissman did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Weissman provided AB with the same, phony, boilerplate back and neck sprain/strain "diagnosis" that he provided to virtually every other Insured. Furthermore, neither AB's presenting problems, nor the treatment plan provided to AB by Zaitsev, Weissman, and Interstate, presented any risk of significant complications, morbidity, or mortality. To the contrary, AB did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Zaitsev, Weissman, and Interstate consisted of medically unnecessary chiropractic, electrodiagnostic testing, and pain management services, none of which posed the least bit of risk to AB. Even so, Zaitsev, Weissman, and Interstate billed GEICO for the initial examination using

CPT code 99204, and thereby falsely represented that Weissman engaged in some legitimate medical decision-making during the purported examination.

164.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

165.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

166.    As set forth above, in the claims identified in Exhibits "1" and "2", virtually all of the Insureds whom Interstate, Highland, Zaitsev, Weissman, Gorman, Reiter, and Ciccone purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

167.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

168.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

169.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "2" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on the exact same date several days, weeks, or even months after their underlying automobile accident.

170.    Even so, in keeping with the fact that Interstate, Highland, Zaitsev, Weissman, Gorman, Reiter, and Ciccone's putative "diagnoses" were phony, and in keeping with the fact

that their putative initial examinations involved no actual medical decision-making at all, Interstate, Highland, Zaitsev, Weissman, Gorman, Reiter, and Ciccone frequently issued substantially identical, phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

171.   For example:

(i)   On October 4, 2012, two Insureds – PG and SH – were involved in the same automobile accident. On December 5, 2012, PG presented to Highland for an initial examination by Ciccone. Then, on February 13, 2015, SH too presented to Highland for an initial examination by Ciccone. PG and SH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Ciccone provided PG and SH with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(ii)   On February 1, 2013, two Insureds – AM and GT – were involved in the same automobile accident. Incredibly, on September 12, 2013 – more than seven months after the accident – AM and GT both presented to Highland for initial examinations by Weissman. AM and GT were different ages, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided AM and GT with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iii)   On February 18, 2013, two Insureds – GC and IC – were involved in the same automobile accident. Incredibly, on May 6, 2013, GC and IC both presented to Highland for initial examinations by Reiter. GC and IC were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Reiter provided GC and IC with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(iv)   On March 5, 2013, <u>three</u> Insureds – MC, MJ, and EV – were involved in the same automobile accident. Incredibly, on June 27, 2013 – more than three months after the accident – MC, MJ, and EV all presented to Highland for initial examinations by Gorman. MC, MJ, and EV were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced

the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gorman provided MC, MJ, and EV with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all three of them.

(v)     On March 25, 2013, two Insureds – JL and SP – were involved in the same automobile accident. Incredibly, on June 20, 2013, JL and SP both presented to Highland for initial examinations by Gorman. JL and SP were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gorman provided JL and SP with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vi)    On April 12, 2013, two Insureds – NC and LM – were involved in the same automobile accident. Incredibly, on August 20, 2013, NC and LM both presented to Highland for initial examinations by Gorman. NC and LM were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gorman provided NC and LM with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(vii)   On April 21, 2013, two Insureds – KJ and OM – were involved in the same automobile accident. Incredibly, on July 16, 2013, KJ and OM both presented to Highland for initial examinations by Weissman. KJ and OM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided  KJ and OM with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(viii)  On July 20, 2013, two Insureds – MS and RZ – were involved in the same automobile accident. Incredibly, on November 14, 2013, MS and RZ both presented to Highland for initial examinations by Weissman. MS and RZ were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided MS and RZ with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(ix)    On August 10, 2013, two Insureds – AL and JL – were involved in the same automobile accident. Incredibly, on September 20, 2013, AL and JL both presented to Highland for initial examinations by Zaitsev. AL and JL were different ages, different sexes, in different physical condition, located in different

positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Zaitsev provided AL and JL with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(x)  On October 7, 2013, two Insureds – MC and CG – were involved in the same automobile accident. Incredibly, on December 12, 2013, MC and CG both presented to Interstate for initial examinations by Ciccone. MC and CG were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Ciccone provided MC and CG with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xi)  On November 5, 2013, two Insureds – FU and HU – were involved in the same automobile accident. Incredibly, on January 30, 2014, FU and HU both presented to Highland for initial examinations by Weissman. FU and HU were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided FU and HU with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xii)  On December 31, 2013, two Insureds – VF and ET – were involved in the same automobile accident. Incredibly, on April 24, 2014, VF and ET both presented to Interstate for initial examinations by Weissman. VF and ET were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided VF and ET with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xiii)  On December 13, 2014, two Insureds – JD and CD – were involved in the same automobile accident. Incredibly, on March 12, 2015, JD and CD both presented to Interstate for initial examinations by Weissman. JD and CD were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided JD and CD with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xiv)   On March 8, 2015, two Insureds – CM and JW – were involved in the same automobile accident. Incredibly, on June 15, 2015, CM and JW both presented to Interstate for initial examinations by Weissman. CM and JW were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided CM and JW with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xv)   On March 10, 2015, two Insureds – FD and TD – were involved in the same automobile accident. Incredibly, on July 1, 2015, FD and TD both presented to Interstate for initial examinations by Weissman. FD and TD were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided FD and TD with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xvi)   On December 13, 2015, two Insureds – YM and SW – were involved in the same automobile accident. Incredibly, on December 30, 2015, YM and SW both presented to Interstate for initial examinations by Gorman. YM and SW were different ages, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gorman provided YM and SW with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xvii)   On December 17, 2015, two Insureds – RR and JV – were involved in the same automobile accident. Incredibly, on March 30, 2016, RR and JV both presented to Interstate for initial examinations by Weissman. RR and JV were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided RR and JV with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xviii)   On December 18, 2015, two Insureds – DM and JW – were involved in the same automobile accident. Incredibly, on March 22, 2016, DM and JW both presented to Interstate for initial examinations by Weissman. DM and JW were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman

provided DM and JW with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xix)   On December 23, 2015, two Insureds – TH and EM – were involved in the same automobile accident. Incredibly, on December 28, 2015, TH and EM both presented to Interstate for initial examinations by Gorman. TH and EM were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Gorman provided TH and EM with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for both of them.

(xx)   On January 11, 2016, four Insureds – FC, CR, NS, and AV – were involved in the same automobile accident. Incredibly, on April 26, 2016, FC, CR, and NS all presented to Interstate for initial examinations by Weissman. Then, on May 24, 2016, AV too presented to Interstate for an initial examination by Weissman. FC, CR, NS, and AV were different ages, different sexes, in different physical condition, located in different positions in the vehicle, and experienced the minor impact from different locations in the vehicle. Even so, at the conclusion of the putative initial examinations, Weissman provided FC, CR, NS, and AV with substantially identical, phony neck and back sprain "diagnoses", and recommended a substantially identical course of treatment for all four of them.

172.   To the extent that the Insureds in the claims identified in Exhibits "1" and "2" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary back or neck sprains or strains.

173.   These ordinary back or neck sprains or strains either had completely resolved by the time the Insureds first presented to Interstate, Highland, Zaitsev, Weissman, Gorman, Reiter, and Ciccone for "treatment", or else were in the process of resolving through conservative treatment.

174.   The diagnosis and treatment of these ordinary back and neck sprains did not require any "moderately complex" or even "low complexity" medical decision-making on the part of Zaitsev, Weissman, Gorman, Reiter, and Ciccone.

175.   In the claims for initial examinations identified in Exhibits "1" and "2", Interstate,

Highland, Zaitsev, Weissman, Gorman, Reiter, and Ciccone  routinely falsely represented that the initial examinations involved "moderate complexity" or "low complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99244, 99204, 99243, and 99203, because CPT codes 99244, 99204, 99243, and 99203 are reimbursable at a higher rate than examinations that do not require moderate or low-complexity medical decision-making.

## 5.    Misrepresentations Regarding the Reimbursable Amount for the Initial Examinations

176.    As set forth above, the No–Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

177.    Not only did Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represent the nature and extent of their putative initial examinations, but Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland also routinely misrepresented the reimbursable amount for the initial examinations.

178.    Specifically, as set forth above and in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland virtually always billed for their putative initial examinations using CPT codes 99203, 99243, 99204, or 99244.

179.    The maximum reimbursable amount for CPT code 99244 was: (i) $193.96, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $200.30, pursuant to the Fee Schedule that was in effect after January 4, 2013.

180.    The maximum reimbursable amount for CPT code 99243 was: (i) $138.02, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $153.17, pursuant to the Fee Schedule that was in effect after January 4, 2013.

181.     The maximum reimbursable amount for CPT code 99203 was: (i) $109.29, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $126.87, pursuant to the Fee Schedule that was in effect after January 4, 2013.

182.     The maximum reimbursable amount for CPT code 99204 was: (i) $147.09, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $193.64, pursuant to the Fee Schedule that was in effect after January 4, 2013.

183.     Nonetheless, and as set forth in Exhibits "1" and "2", in order to maximize their fraudulent charges for the putative initial examinations, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that they were entitled to recover:

(i)       between $139.56 and $425.00 per initial examination under CPT code 99203;

(ii)      between $213.00 and $375.00 per initial examination under CPT code 99204;

(iii)     $350.00 per initial examination under CPT code 99243; and

(iv)      between $250.00 and $425.00 per initial examination under CPT code 99244.

184.     For example:

(i)       Ciccone, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named EL on January 16, 2013;

(ii)      Reiter, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named JM on January 21, 2013;

(iii)     Reiter, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named AL on March 11, 2013;

(iv)      Reiter, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named WF on March 25, 2013;

(v)    Ciccone, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named ED on June 27, 2013;

(vi)    Gorman, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named BM on August 22, 2013;

(vii)    Gorman, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named VR on November 11, 2013;

(viii)    Reiter, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named AP on January 27, 2014;

(ix)    Reiter, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named MD on February 10, 2014;

(x)    Gorman, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named GC on February 17, 2014;

(xi)    Weissman, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named RR on February 18, 2014;

(xii)    Ciccone, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named MR on February 27, 2014;

(xiii)    Weissman, Zaitsev, and Highland  falsely represented that they were entitled to be reimbursed $425.00 under CPT code 99244 for an initial examination they purported to provide to an Insured named JJ on March 13, 2014;

(xiv)    Gorman, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $350.00 under CPT code 99243 for an initial examination they purported to provide to an Insured named MS on August 5, 2014;

(xv)    Gorman, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named LM on August 6, 2014;

(xvi)   Ciccone, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $350.00 under CPT code 99243 for an initial examination they purported to provide to an Insured named MM on July 16, 2015;

(xvii)   Ciccone, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $350.00 under CPT code 99243 for an initial examination they purported to provide to an Insured named YS on July 28, 2015;

(xviii)   Weissman, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named RJ on March 10, 2016;

(xix)   Weissman, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $350.00 under CPT code 99243 for an initial examination they purported to provide to an Insured named JW on March 22, 2016; and

(xx)   Weissman, Zaitsev, and Interstate  falsely represented that they were entitled to be reimbursed $375.00 under CPT code 99204 for an initial examination they purported to provide to an Insured named AA on April 20, 2017.

185.   These are only representative examples. As set forth in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland virtually always falsely represented that they were entitled to be reimbursed for their putative initial examinations in amounts far in excess of the amounts set forth in the Fee Schedule.

186.   Each and every time that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland falsely represented that they were entitled to be reimbursed for their putative initial examinations in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.6.

187.   In the claims identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that they were entitled to be reimbursed for their putative initial examinations in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

**B.     The Fraudulent Follow-up Examinations**

188.    In addition to the fraudulent initial examinations, Highland, Interstate, Zaitsev, Weissman, Ciccone, Gorman, and Reiter purported to subject numerous Insureds in the claims identified in Exhibits "1" and "2" to two or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

189.    As set forth in Exhibits "1" and "2", the follow-up examinations typically were billed through Interstate or Highland to GEICO under CPT codes 99214, 99213, or 99212 resulting in charges between $64.61 and $250.00 for each putative follow-up examination.

190.    In the claims for follow-up examinations identified in Exhibits "1" and "2", the charges for the follow-up examinations were fraudulent in that they misrepresented Interstate and Highland's eligibility to collect PIP Benefits in the first instance.

191.    In fact, Interstate and Highland never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither they nor the examinations were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1.     Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations**

192.    What is more, every claim for follow-up examinations identified in Exhibits "1" and "2" that was billed under CPT codes 99214 or 99213 misrepresented the amount of time that was spent on the follow-up examinations.

193.    Pursuant to the Fee Schedule, the use of CPT code 99214 to bill for a follow-up examination represents that the physician who conducted the examination spent at least 25 minutes of face-to-face time with the patient or the patient's family.

194.    Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up

examination represents that the physician who conducted the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

195.    As set forth in Exhibits "1" and "2", Highland, Interstate, Zaitsev, Weissman, Ciccone, Gorman, and Reiter frequently billed for their putative follow-up examinations using CPT codes 99214 and 99213, and thereby represented that the physicians who conducted the examinations spent either 15 or 25 minutes of face-to-face time with the Insureds or their families.

196.    In fact, in the follow-up examinations identified in Exhibits "1" and "2", neither Zaitsev, Weissman, Ciccone, Gorman, Reiter, nor any other physician associated with Interstate or Highland ever spent 15 minutes of face-to-face time with the Insureds or their families when conducting the follow-up examinations, much less 25 minutes.

197.    Rather, in the follow-up examinations identified in Exhibits "1" and "2", the follow-up examinations rarely lasted more than 5-10 minutes, to the extent that they were provided at all.

198.    In keeping with the fact that the follow-up examinations in the claims identified in Exhibits "1" and "2" rarely lasted more than 5-10 minutes, to the extent that they were conducted at all, Zaitsev, Weissman, Ciccone, Gorman, and Reiter used template forms in purporting to conduct the examinations.

199.    Like the template forms that Zaitsev, Weissman, Ciccone, Gorman, and Reiter used in conducting their putative initial examinations, the template forms that Zaitsev, Weissman, Ciccone, Gorman, and Reiter used in conducting the follow-up examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

200.    All that was required to complete the pre-printed checklist and template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

201.    These interviews and examinations did not require any physician associated with Interstate or Highland to spend more than 10 minutes of face-to-face time with the Insureds during the putative follow-up examinations.

202.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely misrepresented the amount of time that was spent in conducting the follow-up examinations because lengthier examinations that are billable under CPT codes 99215 and 99214 are reimbursable at higher rates than shorter examinations that are billable under other CPT codes.

**2.    Misrepresentations Regarding the Results of the Follow-Up Examinations**

203.    Furthermore, pursuant to the Fee Schedule, when Highland, Interstate, Zaitsev, Weissman, Ciccone, Gorman, and Reiter submitted charges for the follow-up examinations under CPT code 99214, they represented that Zaitsev, Weissman, Ciccone, Gorman, Reiter, or some other healthcare services provider associated with Interstate or Highland performed at least two of the following three components:  (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

204.    Pursuant to the Fee Schedule, when Highland, Interstate, Zaitsev, Weissman, Ciccone, Gorman, and Reiter submitted charges for the follow-up examinations under CPT code 99213, they represented that Zaitsev, Weissman, Ciccone, Gorman, Reiter, or some other healthcare services provider associated with Interstate or Highland performed at least two of the

following three components:  (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

205.    In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

206.    Rather, following each of their purported follow-up examinations, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) told the Insureds to return to Interstate or Highland for additional medically-unnecessary examinations, electrodiagnostic testing, and interventional pain management procedures.

207.    As set forth above, to the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" experienced any injuries at all as the result of their generally-trivial automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

208.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate at regular intervals why continued treatment is necessary beyond the four-week mark.

209.    Even so, in keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support further examinations, expensive diagnostic testing, and interventional pain management procedures by the Defendants, Zaitsev,

Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely purported to diagnose continuing back pain, neck pain in the Insureds long after the minor underlying automobile accidents occurred, and long after any back pain, neck pain, and headache attendant to the minor automobile accidents would have resolved.

210.    For example:

(i)    On December 14, 2012, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain at the scene. In keeping with the fact that IF was not injured, he did not visit any hospital following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, at the conclusion of a purported follow-up examination at Highland on April 29, 2013, Weissman falsely reported that IF continued to suffer from high levels of pain and range of motion deficits as a result of his more than five month-old accident, and recommended that IF return to Highland for a pain management consultation.

(ii)    On November 4, 2012, an Insured named WF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WF's vehicle was drivable following the accident. The police report further indicated that WF was not injured and did not complain of any pain at the scene. In keeping with the fact that WF was not injured, he did not visit any hospital following the accident. To the extent that WF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, at the conclusion of a purported follow-up examination at Highland on April 22, 2013, Reiter falsely reported that WF continued to suffer from high levels of pain and range of motion deficits as a result of his more than five month-old accident, and recommended that WF return to Highland for a pain management consultation.

(iii)    On October 14, 2013, an Insured named JB was involved in a minor automobile accident. In keeping with the fact that JB was not injured, he did not visit any hospital following the accident. To the extent that JB experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within nine months of the accident. Even so, at the conclusion of a purported follow-up examination at Highland on July 18, 2013, Weissman falsely reported that JB continued to suffer from high levels of

pain and range of motion deficits as a result of his nine month-old accident, and recommended that JB return to Highland for a pain management consultation.

(iv)     On September 22, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the minor accident. Even so, at the conclusion of a purported follow-up examination at Interstate on February 3, 2016, Ciccone falsely reported that JR continued to suffer from high levels of pain and range of motion deficits as a result of his more than four month-old accident, and recommended that JR return to Interstate for a pain management consultation.

(v)      On January 11, 2016, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not injured, he did not visit any hospital following the accident. To the extent that CR experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, at the conclusion of a purported follow-up examination at Interstate on June 28, 2016, Gorman falsely reported that CR continued to suffer from high levels of pain and range of motion deficits as a result of his more than five month-old accident, and recommended that CR return to Interstate for pain management injections.

(vi)     On January 11, 2016, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not injured, she did not visit any hospital following the accident. To the extent that AV experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, at the conclusion of a purported follow-up examination at Interstate on June 28, 2016, Gorman falsely reported that AV continued to suffer from high levels of pain and range of motion deficits as a result of her more than five month-old accident, and recommended that AV return to Interstate for pain management injections.

(vii)    On January 11, 2016, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

69

low-speed, low-impact collision. The police report further indicated that JO was not injured and did not complain of any pain at the scene. In keeping with the fact that JO was not injured, she did not visit any hospital following the accident. To the extent that JO experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the accident. Even so, at the conclusion of a purported follow-up examination at Interstate on May 12, 2016, Gorman falsely reported that JO continued to suffer from high levels of pain and range of motion deficits as a result of her four month-old accident, and recommended that JO return to Interstate for pain management injections.

211.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that the Insureds continued to suffer pain as the result of minor soft tissue injuries long after the underlying accidents occurred, because these phony diagnoses provided a false basis for continued, medically unnecessary treatment at Interstate and Highland.

## 3.    Misrepresentations Regarding the Reimbursable Amount for the Follow-Up Examinations

212.    Not only did Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represent the results of the follow-up examinations, but Zaitsev, Weissman, Ciccone, Gorman, Lynch, Lundberg, Interstate, and Highland also routinely misrepresented the reimbursable amount for the follow-up examinations.

213.    The No-Fault Laws provide that follow-up examinations may only be billed contemporaneously with chiropractic and physical therapy treatments if one of the following four circumstances is present:

    (i)      there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

    (ii)     the patient fails to respond to treatment, requiring a change in the treatment plan;

    (iii)    the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

(iv)     it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n).

214.    Even so, Zaitsev, Weissman, Ciccone, Gorman, Lynch, Lundberg, and Interstate routinely billed for follow-up examinations contemporaneously with physical therapy treatments, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

215.    For example:

(i)     Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named LB on May 6, 2014, May 20, 2014, June 3, 2014, June 5, 2014, June 12, 2014, June 17, 2014, June 24, 2014, and July 8, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii)     Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named SB on July 31, 2014, August 4, 2014, August 5, 2014, August 14, 2014, September 10, 2014, September 18, 2014, and September 30, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman,

Ciccone, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)     Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named QA on October 9, 2014, October 14, 2014, October 21, 2014, October 23, 2014, November 4, 2014, November 10, 2014, December 16, 2014, and January 22, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iv)     Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named ED on January 6, 2015, January 8, 2015, January 15, 2015, January 22, 2015, February 2, 2015, and March 16, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)     Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named JC on February 23, 2015, March 11, 2015, March 18, 2015, March 24, 2015, April 2, 2015, April 7, 2015, and April 15, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)     Zaitsev, Gorman, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named LE on May 28, 2015, June 5, 2015, July 9, 2015, July 14, 2015, July 28, 2015, and August 25, 2015 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)    Zaitsev, Gorman, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named AD on June 1, 2015 June 17, 2015, June 24, 2015, July 1, 2015, July 7, 2015, July 28, 2015, and August 10, 2015 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)   Zaitsev, Gorman, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named JC on October 26, 2015, November 4, 2015, November 5, 2015, and December 7, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ix)     Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named MA on August 26, 2016, September 10, 2016, September 16, 2016, September 22, 2016, September 24, 2016, October 13, 2016, October 16, 2016, November 3, 2016, November 13, 2016, and December 9, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment

plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Ciccone, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x)     Zaitsev, Gorman, Lynch, Lundberg, and Interstate billed GEICO for follow-up examinations they purported to provide contemporaneously with physical therapy treatments to an Insured named IA on November 18, 2016, November 19, 2016, November 25, 2016, December 2, 2016, and January 20, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Zaitsev, Gorman, Lynch, Lundberg, and Interstate were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

216.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

217.    As set forth above and in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely billed for their putative initial examinations using CPT codes 99213 or 99214.

218.    The maximum reimbursable amount for CPT code 99213 was: (i) $59.87, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $85.01, pursuant to the Fee Schedule that was in effect after January 4, 2013.

219.    The maximum reimbursable amount for CPT code 99214 was: (i) $93.57, pursuant to the Fee Schedule that was in effect between August 10, 2009 and January 3, 2013; and (ii) $125.71, pursuant to the Fee Schedule that was in effect after January 4, 2013.

220.     Nonetheless, and as set forth in Exhibits "1" and "2", in order to maximize their fraudulent charges for the putative follow-up examinations, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that they were entitled to recover:

(i)      between $106.00 and $200.00 per initial examination under CPT code 99213; and

(ii)     between $138.28 and $250.00 per initial examination under CPT code 99214.

221.     Each and every time that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland falsely represented that they were entitled to be reimbursed for their putative follow-up examinations in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.6.

222.     In the claims identified in Exhibits "1" and "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland routinely falsely represented that they were entitled to be reimbursed for their putative follow-up examinations in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

## C.     The Fraudulent Charges for Computerized Range of Motion and Muscle Strength Tests

223.     In an attempt to maximize the fraudulent billing that they submit or cause to be submitted for each Insured, after purporting to provide initial examinations at Interstate, Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Interstate instructed many Insureds to return for one or more rounds of medically useless computerized range of motion and muscle strength tests.

224.     As set forth in Exhibit "1", Zaitsev, Lynch, Lundberg, and Interstate then purported to provide, and billed, the computerized range of motion tests to GEICO under CPT code 95851, and the computerized muscle strength tests to GEICO under CPT code 95831,

typically resulting in over $1,000.00 in charges for every Insured who supposedly received the tests.

225.    The charges for the computerized range of motion and muscle strength tests were fraudulent in that the computerized range of motion and muscle strength tests were medically unnecessary and were performed pursuant to the Defendants' fraudulent treatment and billing protocol, not to legitimately treat or otherwise benefit the Insureds who were subjected to them.

226.    Moreover, in the claims for the computerized range of motion and muscle strength tests identified in Exhibits "1" and "2", the charges for the computerized range of motion and muscle strength tests were fraudulent in that they misrepresented Interstate's eligibility to collect PIP Benefits in the first instance.

227.    In fact, Interstate never was eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither Interstate nor the computerized range of motion and muscle strength tests were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1.     Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

228.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

229.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range

of motion is the amount that a joint will move from a straight position to its bent or hinged position.

230.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

231.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

232.    Physical examinations performed on patients with soft-tissue trauma – the alleged complaint advanced by virtually every Insured who treated with Interstate and Highland – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning.  Unless a physician knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

233.    Since range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up

examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an element of the initial consultations and follow-up examinations.

234.    In other words, healthcare providers cannot conduct and bill for an initial consultation or follow-up examination, then bill separately for contemporaneously-provided computerized range of motion and muscle strength tests.

## 2.    The Duplicate Billing for Medically Unnecessary Computerized Range of Motion Tests

235.    To the extent that the Defendants actually provided initial examinations and follow-up examinations in the first instance, physicians associated with Interstate – typically Zaitsev, Weissman, Ciccone, Gorman, or Reiter – purported to conduct manual range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

236.    The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that the Defendants routinely submitted for the initial examinations under CPT codes 99203, 99243, 99204, and 99244, and for the follow-up examinations under CPT codes 99213 and 99214.

237.    Despite the fact that every Insured already purportedly had undergone manual range of motion and muscle testing during their initial examinations and/or follow-up examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the initial examinations and/or follow-up examinations, Zaitsev, Lynch, Lundberg, and Interstate systemically billed for, and purported to provide, a series of computerized range of motion and muscle strength tests to most Insureds.

238.   Though the Insureds routinely visited Interstate several times per month for follow-up examinations and other Fraudulent Services, Zaitsev, Lynch, Lundberg, and Interstate often deliberately scheduled separate appointments for computerized range of motion and muscle strength tests so that they could bill for those procedures separately, without having to include them in the billing for the follow-up examinations, as required by the Fee Schedule.

239.   Zaitsev, Lynch, Lundberg, and Interstate purported to provide the computerized range of motion and muscle strength tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies (affixed by Velcro straps) while the Insured was asked to attempt various motions and movements.  The test was virtually identical to the manual range of motion testing that is described above and that purportedly was performed during each initial examination and follow-up examination, except that a digital printout was obtained rather than the provider manually documenting the Insured's range of motion.

240.   Zaitsev, Lynch, Lundberg, and Interstate purported to provide the computerized muscle strength tests by placing a strain gauge-type measurement apparatus against a stationary object, against which the patient pressed three-to-four separate times using various muscle groups. As with the computerized range of motion and muscle strength tests, this computerized muscle strength test was virtually identical to the manual muscle strength testing that is described above and that purportedly was performed during the initial examinations and/or follow-up examinations – except that a digital printout was obtained.

241.   The information gained through the use of the computerized range of motion and muscle strength tests was not significantly different from the information obtained through the manual testing that was part and parcel of virtually every Insured's initial examination and follow-up examinations.

242.   In the relatively minor soft-tissue injuries allegedly sustained by the Insureds – to the extent that any of the Insureds suffered any injuries at all as the result of the automobile accidents they purported to experience – the difference of a few percentage points in the Insureds' range of motion reading or pounds of resistance in the Insureds' muscle strength testing was meaningless. This is evidenced by the fact that neither Zaitsev, Lynch, Lundberg, nor any other healthcare provider associated with Interstate, ever incorporated the results of computerized range of motion and muscle strength tests into the rehabilitation programs of any of the Insureds whom they purported to treat.

243.   The computerized range of motion and muscle strength tests were part and parcel of the Defendants' fraudulent scheme, inasmuch as the "service" was rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

244.   In keeping with the fact that the computerized range of motion tests were medically unnecessary, New Jersey law actually prohibits physicians such as Zaitsev from billing for computerized range of motion tests.

245.   Specifically, N.J.A.C. 13:35-2.6(c) provides, in pertinent part, that no practitioner "shall bill for any diagnostic tests which fail to yield data of sufficient clinical value in the development, evaluation or implementation of a plan of treatment, including the following: … Computer supported range of motion tests."

246.   In the claims for computerized range of motion testing under CPT code 95851 that are identified in Exhibit "1", each such charge constituted a separate violation of N.J.A.C. 13:35-2.6(c).

3.      **The Fraudulent Unbundling of Charges for the Computerized Range of Motion and Muscle Tests**

247.    Not only did Zaitsev, Lynch, Lundberg, and Interstate deliberately purport to provide duplicative, medically unnecessary computerized range of motion and muscle tests, they also unbundled their billing for the tests in order to maximize the fraudulent charges that they could submit through Interstate to GEICO.

248.    Pursuant to the CPT Assistant, when computerized range of motion testing and muscle testing are performed on the same date, all of the testing should be reported and billed using CPT code 97750.

249.    CPT code 97750 is a "time-based" code that – in New Jersey  – allows for a maximum charge of $55.79 for every 15 minutes of testing that is performed.

250.    Thus, if a healthcare provider performed 15 minutes of computerized range of motion and muscle testing, it would be permitted a single charge of $55.79 under CPT code 97750. If the provider performed 30 minutes of computerized range of motion and muscle testing, it would be permitted to submit two charges of $55.79 under CPT code 97750, resulting in total charges of $111.58. If the provider performed 45 minutes of computerized range of motion and muscle testing, it would be permitted to submit three charges of $55.79 under CPT code 97750, resulting in total charges of $167.37, and so forth.

251.    In the claims for computerized range of motion and muscle tests that are identified in Exhibits "1", Zaitsev, Lynch, Lundberg, and Interstate  virtually always purported to provide the computerized range of motion and muscle tests to Insureds on the same dates of service.

252.    To the extent that Zaitsev, Lynch, Lundberg, and Interstate actually provided the computerized range of motion and muscle tests to Insureds in the first instance, the computerized

range of motion and muscle tests – together – virtually never took more than 15 minutes to perform. Thus, even if the computerized range of motion and muscle tests that Zaitsev, Lynch, Lundberg, and Interstate purported to provide were medically necessary, and performed in the first instance, Zaitsev, Lynch, Lundberg, and Interstate would be limited to a single, time-based charge of $55.79 under CPT code 97750 for each date of service on which they performed computerized range of motion and muscle tests on an Insured.

253.    However, in order to maximize their fraudulent billing for the computerized range of motion and muscle tests, Zaitsev, Lynch, Lundberg, and Interstate routinely unbundled what should have been – at most – a single charge of $55.79 under CPT code 97750 for both computerized range of motion and muscle testing into: (i) multiple charges under CPT code 95831 (for the muscle tests); and multiple charges under CPT code 95851 (for the range of motion tests).

254.    By unbundling what should – at most – have been a single $55.79 charge under CPT code 97750 into multiple charges under CPT codes 95831 and 95851, Zaitsev, Lynch, Lundberg, and Interstate generally submitted charges of more than $1,000.00 per Insured for each round of computerized range of motion and muscle testing they purported to provide.

255.    In addition to misrepresenting the medical necessity of the computerized range of motion and muscle tests, and whether they were reimbursable in the first instance, each of the unbundled charges for computerized range of motion and muscle tests that are identified in Exhibit "1" constituted a separate violation of N.J.A.C. 11:3-29.4.

**D.    The Fraudulent Charges for Electrodiagnostic Testing**

256.    Based upon the fraudulent, pre-determined findings and diagnoses provided during the initial examinations, Zaitsev, Ciccone, Reiter, Interstate, and Highland purported to

subject most Insureds to a series of medically unnecessary nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests (collectively the "electrodiagnostic" or "EDX" tests).

257.   As set forth in Exhibits "1" and "2", Zaitsev, Ciccone, Reiter, Interstate, and Highland then billed the EDX tests to GEICO under CPT codes 95886,  95911, and 95913, generally resulting in combined charges of at least $4,000.00 for each Insured on whom the EDX testing purportedly was performed.

258.   In the claims for EDX tests identified in Exhibits "1" and "2", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all –pursuant to the phony boilerplate "findings" and "diagnoses" that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland purported to provide during their phony initial and follow-up examinations.

259.   Moreover, in the claims for EDX tests identified in Exhibits "1" and "2", the charges for the EDX tests were fraudulent in that they misrepresented Interstate and Highland's eligibility to collect PIP Benefits in the first instance.

260.   In fact, Interstate and Highland never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent conduct described herein – neither Interstate, Highland, nor the EDX tests were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**1.      The Illegal Self-Referrals for Electrodiagnostic Testing**

261.   What is more, and as set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "healthcare service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9–22.5.

262.    However – and again, as set forth above – the Codey Law's restrictions on patient referrals do not apply to:

> medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

See id.

263.    Zaitsev and Weissman – as licensed physicians – were "practitioners" as defined by the Codey Law. See N.J.S.A. 45:9-22.4.

264.    Interstate was a "healthcare service" as that term is defined in the Codey Law, in that it was a "business entity which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ." Id.

265.    In the context of the Codey Law, Zaitsev – who owned Interstate – had a "significant beneficial interest" in Interstate. Id.

266.    In the context of the Codey Law, Weissman was Zaitsev's employee at Interstate.

267.    As a result, Zaitsev and Weissman could not lawfully refer Insureds to Interstate for electrodiagnostic testing unless – among other things – the resulting electrodiagnostic tests were provided at Zaitsev's own medical offices. See N.J.S.A. 45:9-22-5(c)(1).

268.    Even so, in the claims identified in Exhibit "1", Zaitsev and Weissman routinely and unlawfully self-referred Insureds to Interstate for EMG and NCV tests that were not provided at Zaitsev's medical offices.

269.    Specifically, in many of the claims for initial examinations and EDX tests identified in Exhibit "1", Zaitsev and Weissman referred Insureds to Interstate for EDX testing that was provided, to the extent that it was provided at all, at the offices of a chiropractor named Joseph Nieroda, D.C. ("Nieroda"), and his chiropractic professional corporation, Elizabeth

84

Avenue Chiropractic Center, P.C. ("Elizabeth Avenue Chiropractic"), located at 925 Elizabeth Avenue, Elizabeth, New Jersey 07201 (the "Elizabeth Avenue Location").

270.    Thereafter, Zaitsev, Ciccone, and Reiter would purport to provide the EDX testing at the Elizabeth Avenue Location, rather than at Interstate's offices or at any other medical office owned by Zaitsev.

271.    The Elizabeth Avenue Location was a distinct facility that operated from a different location than Interstate or any other medical office owned by Zaitsev.

272.    Upon information and belief, the Elizabeth Avenue Location had its own staff, who were employed by Nieroda and Elizabeth Avenue Chiropractic, rather than by Interstate or any other medical office owned by Zaitsev.

273.    Upon information and belief, the sign outside the Elizabeth Avenue Location identified Elizabeth Avenue Chiropractic and Nieroda, and made no reference to Interstate or any other medical office owned by Zaitsev.

274.    As a result, the exception to the Codey Law for "medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office" did not apply to Zaitsev and Weissman's self-referrals to Interstate for purported EDX testing.

275.    Even so, Zaitsev and Weissman routinely and unlawfully self-referred Insureds to Interstate for EDX testing that was provided – to the extent that it was provided at all – at the Elizabeth Avenue Location, rather than at Interstate or any other medical office owned by Zaitsev.

276.    For example:

(i)    On or about January 29, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named VB to Interstate for EMG and NCV tests. The self-referral

violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on February 13, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(ii)    On or about February 26, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named GJ to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on March 6, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(iii)   On or about April 16, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named JD to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on May 19, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(iv)    On or about July 2, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named YS to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on July 28, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(v)     On or about July 16, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named JZ to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on August 28, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(vi)    On or about August 20, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named CR to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on September 8, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(vii)   On or about October 8, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named EJ to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on November 24, 2015 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(viii)  On or about November 12, 2015, Weissman – at Zaitsev's direction – self-referred an Insured named JW to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on December 7, 2015 at the

Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(ix)     On or about February 18, 2016, Weissman – at Zaitsev's direction – self-referred an Insured named MA to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on March 15, 2016 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(x)      On or about April 14, 2016, Weissman – at Zaitsev's direction – self-referred an Insured named MB to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on April 28, 2016 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(xi)     On or about April 15, 2016, Weissman – at Zaitsev's direction – self-referred an Insured named MC to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on April 28, 2016 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(xii)    On or about February 2, 2017, Weissman – at Zaitsev's direction – self-referred an Insured named HR to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on February 21, 2017 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(xiii)   On or about February 23, 2017, Weissman – at Zaitsev's direction – self-referred an Insured named VM to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on March 28, 2017 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(xiv)    On or about March 9, 2017, Weissman – at Zaitsev's direction – self-referred an Insured named AF to Interstate for EMG and NCV tests. The self-referral violated the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on March 28, 2017 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

(xv)     On or about March 9, 2017, Weissman – at Zaitsev's direction – self-referred an Insured named JB to Interstate for EMG and NCV tests. The self-referral violated

the Codey Law because the resulting EMG and NCV tests were provided, to the extent that they were provided at all, on April 18, 2017 at the Elizabeth Avenue Location, rather than at Zaitsev or Interstate's own medical office.

277.   These are only representative examples. In the claims identified in Exhibit "1", Zaitsev, Weissman, and Interstate routinely engaged in a pattern of illegal self-referrals for EDX tests.

278.   In the claims identified in Exhibit "1", Zaitsev, Weissman, and Interstate falsely represented that they were in compliance with all relevant laws governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits in the first instance.

279.   In fact, Zaitsev, Weissman, and Interstate were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they engaged in illegal self-referrals in pervasive violation of the Codey Law.

## 2.   The Human Nervous System and Electrodiagnostic Testing

280.   The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

281.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the

body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

282.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

283.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Zaitsev, Ciccone, Reiter, Interstate, and Highland because they were medically necessary to determine whether the Insureds had radiculopathies.

284.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

285.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

286.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

287.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

3.     **The Fraudulent NCV Tests**

288.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

289.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

290.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

291.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

292.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Zaitsev, Ciccone, Reiter, Interstate, and Highland routinely purported to test

90

far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Zaitsev, Ciccone, Reiter, Interstate, and Highland routinely purported to perform and/or provide: (i) NCV tests of 8 motor nerves; (ii) NCV tests of 6-10 sensory nerves; as well as (iii) multiple H-reflex studies.

293.    For example:

(i)     On March 25, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SP, supposedly to determine whether SP suffered from a radiculopathy.

(ii)    On April 1, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named BG, supposedly to determine whether BG suffered from a radiculopathy.

(iii)   On April 19, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named AD, supposedly to determine whether AD suffered from a radiculopathy.

(iv)    On May 23, 2013, Ciccone, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SL, supposedly to determine whether SL suffered from a radiculopathy.

(v)     On June 6, 2013, Ciccone, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SP, supposedly to determine whether SP suffered from a radiculopathy.

(vi)    On July 15, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 8 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named MR, supposedly to determine whether MR suffered from a radiculopathy.

(vii)   On September 16, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named LP, supposedly to determine whether LP suffered from a radiculopathy.

(viii)   On September 16, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named EL, supposedly to determine whether EL suffered from a radiculopathy.

(ix)   On October 4, 2013, Ciccone, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named GT, supposedly to determine whether GT suffered from a radiculopathy.

(x)   On October 28, 2013, Reiter, Zaitsev, and Highland purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SW, supposedly to determine whether SW suffered from a radiculopathy.

(xi)   On December 23, 2013, Zaitsev, Interstate, and a physician named Cyrus Cosough, M.D. purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named HK, supposedly to determine whether HK suffered from a radiculopathy.

(xii)   On January 29, 2015, Ciccone, Zaitsev, and Interstate purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named MG, supposedly to determine whether MG suffered from a radiculopathy.

(xiii)   On February 3, 2015, Ciccone, Zaitsev, and Interstate purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named WJ, supposedly to determine whether WJ suffered from a radiculopathy.

(xiv)   On March 3, 2015, Ciccone, Zaitsev, and Interstate purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JS, supposedly to determine whether JS suffered from a radiculopathy.

(xv)   On March 3, 2015, Ciccone, Zaitsev, and Interstate purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named NV, supposedly to determine whether NV suffered from a radiculopathy.

(xvi)   On January 27, 2016, Ciccone, Zaitsev, and Interstate purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named CC, supposedly to determine whether CC suffered from a radiculopathy.

(xvii)   On April 27, 2016, Zaitsev, Interstate, and a physician named Bradley Bodner, D.O. ("Bodner") purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named RH, supposedly to determine whether RH suffered from a radiculopathy.

(xviii)  On September 15, 2016, Zaitsev, Interstate, and Bodner purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JC, supposedly to determine whether JC suffered from a radiculopathy.

(xix)    On September 15, 2016, Bodner, Zaitsev, and Interstate purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named MM, supposedly to determine whether MM suffered from a radiculopathy.

(xx)     On May 2, 2016, Zaitsev, Interstate, and a physician named Paul Kosmorsky, D.O. ("Kosmorsky") purported to provide 8 motor nerve NCV tests, 6 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named CQ, supposedly to determine whether CQ suffered from a radiculopathy.

294.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare services providers in the northern New Jersey area to submit maximum charges of: (i) $161.84 for each motor nerve in any limb on which an NCV was performed, under CPT code 95903; and (ii) $131.00 for each sensory nerve in any limb on which an NCV was performed, under CPT code 95904.

295.    Zaitsev, Ciccone, Reiter, Interstate, and Highland routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

296.    In keeping with the fact that Zaitsev, Ciccone, Reiter, Interstate, and Highland routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they could submit to

GEICO and other insurers, Zaitsev, Interstate, and Highland paid larger kickbacks to their referral sources if their referral sources "requested" the performance of a larger number of NCV tests.

297.    For example, in his plea allocution, Dimeo gave testimony that Zaitsev, through an intermediary, offered to pay $250.00 in kickbacks per referral if Dimeo requested the performance of a larger number of NCV tests, and only $150.00 per referral if Dimeo requested the performance of a smaller number of NCV tests. See Exhibit "5".

298.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

299.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

300.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

301.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

302.    Zaitsev, Ciccone, Reiter, Interstate, and Highland did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

303.    Instead, Zaitsev, Ciccone, Reiter, Interstate, and Highland applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same exact peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibits "1" and "2".

304.    Specifically, in virtually every claim for NCV testing identified in Exhibits "1" and "2", Zaitsev, Ciccone, Reiter, Interstate, and Highland purported to test some combination of the following peripheral nerves and nerve fibers – and, in the substantial majority of cases, all of them – in each Insured to whom they purported to provide NCV tests:

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right tibial motor nerves;

(iv)     left and right ulnar motor nerves;

(v)      left and right median sensory nerves;

(vi)     left and right radial sensory nerves;

(vii)    left and right superficial peroneal sensory nerves;

(viii)   left and right sural sensory nerves; and

(ix)     left and right ulnar sensory nerves

305.    The cookie-cutter approach to the NCVs that Zaitsev, Ciccone, Reiter, Interstate, and Highland purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that Zaitsev, Ciccone, Reiter, Interstate, and Highland could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**4.     The Fraudulent EMG Tests**

306.    EMGs involve insertion of a needle into various muscles in the spinal area

("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

307.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

308.    Zaitsev, Reiter, Ciccone, Interstate, and Highland did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

309.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

310.    Even if there were any need for any of the EMG tests that Zaitsev, Reiter, Ciccone, Interstate, and Highland purported to provide, the nature and number of the EMGs that Zaitsev, Reiter, Ciccone, Interstate, and Highland purported to provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

311.    In the substantial majority of the claims for EMG tests identified in Exhibits "1"

and "2", Zaitsev, Reiter, Ciccone, Interstate, and Highland purported to provide and/or perform EMGs on four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit to GEICO.

312.    For example:

(i)     On January 21, 2013, Reiter, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named AP.

(ii)    On February 4, 2013, Reiter, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named JM.

(iii)   On March 11, 2013, Ciccone, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named MM.

(iv)    On March 25, 2013, Reiter, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named AL.

(v)     On April 19, 2013, Ciccone, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named BG.

(vi)    On May 20, 2013, Reiter, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named JY.

(vii)   On September 16, 2013, Reiter, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named EL.

(viii)  On September 16, 2013, Reiter, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named KL.

(ix)    On October 4, 2013, Ciccone, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named GT.

(x)     On October 24, 2013, Ciccone, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named MF.

(xi)    On October 25, 2013, Ciccone, Zaitsev, and Highland purported to provide a medically unnecessary four-limb EMG to an Insured named JV.

(xii)   On October 28, 2013, Reiter, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named SW.

(xiii)  On February 10, 2014, Reiter, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named AP.

(xiv)   On February 10, 2014, Reiter, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named DD.

(xv)   On February 24, 2014, Reiter, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named KC.

(xvi)   On February 24, 2014, Reiter, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named MC.

(xvii)   On March 6, 2014, Ciccone, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named MR.

(xviii)   On May 1, 2014, Ciccone, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named SG.

(xix)   On May 19, 2015, Ciccone, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named LC.

(xx)   On February 3, 2016, Ciccone, Zaitsev, and Interstate purported to provide a medically unnecessary four-limb EMG to an Insured named MM.

313.   Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare services providers in the northern New Jersey area to submit maximum charges of: (i) $213.46 under CPT code 95860 if an EMG was performed on at least five muscles of one limb; (ii) $263.46 under CPT code 95861 if an EMG was performed on at least five muscles in each of two limbs; (iii) $321.92 under CPT code 95863 if an EMG was performed on at least five muscles in each of three limbs; and (iv) $421.04 under CPT code 95864 if an EMG was performed on at least five muscles in each of four limbs.

314.   In the vast majority of the EMG claims identified in Exhibits "1" and "2", Zaitsev, Reiter, Ciccone, Interstate, and Highland purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

315.   In keeping with the fact that Zaitsev, Ciccone, Reiter, Interstate, and Highland

routinely purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured, Zaitsev, Interstate, and Highland paid larger kickbacks to their referral sources if their referral sources "requested" the performance of a larger number of EMG tests.

316.    For example, in his plea allocution, Dimeo gave testimony that Zaitsev, through an intermediary, offered to pay $250.00 in kickbacks per referral if Dimeo requested the performance of four-limb EMG tests, and only $150.00 per referral if Dimeo requested the performance of two-limb EMG tests. See Exhibit "5".

**5.    The Fraudulent Radiculopathy Diagnoses**

317.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

318.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary electrodiagnostic testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom Zaitsev, Reiter, Ciccone, Interstate, and Highland purportedly treated.

319.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is actually significantly lower than 19 percent.

320.    Virtually none of the Insureds whom Zaitsev, Reiter, Ciccone, Interstate, and Highland purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

321.    Even so, in the EMG and NCV claims identified in Exhibits "1" and "2", Zaitsev, Reiter, Ciccone, Interstate, and Highland falsely purported to identify radiculopathies in the vast majority of the Insureds to whom they purported to provide EMG and NCV testing.

322.    Zaitsev, Reiter, Ciccone, Interstate, and Highland falsely purported to arrive at these pre-determined and phony radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

**6.    Misrepresentations Regarding the Reimbursable Amount for EDX Testing**

323.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

324.    Not only did Zaitsev, Reiter, Ciccone, Interstate, and Highland routinely falsely represent that their excessive EDX testing was medically necessary, and routinely falsely represent the results of the EDX tests, but they also routinely misrepresented the reimbursable amount for the EDX tests.

325.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare providers in the northern New Jersey area to submit maximum charges of: (i) $1,410.80 for an eight motor nerve NCV (including any F-wave studies); (ii) $1,627.68 for a 10 sensory nerve NCV; (iii) $311.86 for two H-reflex studies; and (iv) $434.98 for a four-limb EMG.

326.    Thus, a healthcare provider that provided an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG would be entitled to recover a maximum of $3,785.32 for the combined testing – assuming that the testing was medically necessary in the first instance, and the product of a lawful referral.

327.    However, to maximize their fraudulent billing for their medically unnecessary EDX testing, Zaitsev, Reiter, Ciccone, Interstate, and Highland routinely falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG.

328.    For example:

(i)     Reiter, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named SP on March 25, 2013.

(ii)    Reiter, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named BG on April 19, 2013.

(iii)   Ciccone, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named SP on June 6, 2013.

(iv)    Reiter, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named LP on September 16, 2013.

(v)     Reiter, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named EL on September 16, 2013.

(vi)    Ciccone, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10

sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named MG on January 29, 2015.

(vii)   Ciccone, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named WJ on February 3, 2015.

(viii)  Ciccone, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named JS on March 3, 2015.

(ix)    Ciccone, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named NV on March 3, 2015.

(x)     Ciccone, Zaitsev, and Highland falsely represented that they were entitled to recover $7,250.00 for an eight motor nerve NCV with F-wave studies, a 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG that they purported to provide to an Insured named CC on January 27, 2016.

329.    These are only representative examples. As set forth in Exhibits "1" and "2", Zaitsev, Reiter, Ciccone, Interstate, and Highland routinely falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule.

330.    Each and every time that Zaitsev, Reiter, Ciccone, Interstate, and Highland falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

331.    In the claims identified in Exhibits "1" and "2", Zaitsev, Reiter, Ciccone, Interstate, and Highland routinely falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

**E.      The Fraudulent Charges for PNT Services at Interstate**

332.     As set forth in Exhibit "1", based upon the phony, boilerplate "diagnoses" that Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Interstate provided at the conclusion of their putative initial examinations, and the phony radiculopathy "diagnoses" that Zaitsev, Reiter, Ciccone, and Interstate provided at the conclusion of their ersatz EDX tests, Zaitsev, Gorman, and Interstate purported to subject many Insureds to a series of PNT sessions.

333.     Gorman purported to perform virtually all of the putative PNT services at Interstate.

334.     As set forth in Exhibit "1", Zaitsev, Gorman, and Interstate then billed the PNT sessions to GEICO under CPT code 64999, typically resulting in charges of either $358.24 or $716.48 for each putative PNT session they purported to provide.

335.     In the claims for PNT sessions identified in Exhibit "1", the charges for the PNT sessions were fraudulent in that the PNT sessions were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony "diagnoses" that Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Interstate provided to the Insureds at the conclusion of the putative initial and follow-up examinations, and the phony radiculopathy "diagnoses" that Zaitsev, Reiter, Ciccone, Interstate, and Highland provided at the conclusion of their ersatz EDX tests.

336.     Moreover, in the claims for PNT sessions identified in Exhibit "1", the charges for the EDX tests were fraudulent in that they misrepresented Interstate's eligibility to collect PIP Benefits in the first instance.

337.     In fact, Interstate never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent conduct described herein

– neither Interstate nor the PNT sessions were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

338.    In a legitimate clinical setting, PNT is a procedure that combines the features of electroacupuncture and transcutaneous electrical nerve stimulation, whereby electrical current is applied through the skin to provide patients with pain control. PNT is administered through fine needle-like electrodes that are placed in close proximity to the painful area and stimulate peripheral sensory nerves in the soft tissue.

339.    There is no CPT code assigned to PNT sessions, and the Fee Schedule does not set forth any specific reimbursable amount for PNT sessions.

340.    As a result, Zaitsev, Gorman, and Interstate billed for the PNT sessions using CPT code 64999, which is the CPT code reserved for an unlisted neurological procedure.

341.    Pursuant to the Fee Schedule, when submitting bills using CPT code 64999 a healthcare provider is required to base its charges on a comparable procedure.

342.    As set forth above, in a legitimate clinical setting, PNT is a procedure that combines the features of electroacupuncture and transcutaneous electrical nerve stimulation.

343.    Pursuant to the Fee Schedule, the maximum reimbursable amount for electroacupuncture in the southern New Jersey area is $35.12.

344.    Pursuant to the Fee Schedule, the maximum reimbursable amount for electrical stimulation in the southern New Jersey area is $19.25.

345.    To the extent that Zaitsev, Gorman, and Interstate provided any legitimate PNT sessions in the first instance, they were not entitled to recover more than either $19.25 or – at most – $35.12 for the PNT sessions.

346.    Even so, in all of the claims for purported PNT treatments that are identified in Exhibit "1", Zaitsev, Gorman, and Interstate falsely represented that they were entitled to recover either $358.24 or $716.48 for the putative PNT sessions.

347.    Each and every one of Zaitsev, Gorman, and Interstate's inflated charges for PNT sessions constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

## F.    The Fraudulent Charges for Pain Management Injections

348.    As set forth in Exhibits "1" and "2", based upon the phony, boilerplate "diagnoses" that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland provided during their fraudulent initial and follow–up examinations, Zaitsev, Weissman, Gorman, Interstate, and Highland  purported to subject many Insureds to a series of medically unnecessary pain management injections, including but not limited to epidural and facet injections, often purportedly performed under fluoroscopic guidance or with epidurography.

349.    Zaitsev, Weissman, and Gorman purported to perform the majority of the injections, which then were billed to GEICO through Interstate or Highland, typically as multiple charges under CPT codes 62310, 62311, 64483, 64484, 64490, 64491, 64493, 64494, 64495, 72275, and/or 77003.

## 1.    The Illegal Self-Referrals for Pain Management Injections

350.    As set forth above, the Codey Law provides – in substance – that a "practitioner" may not refer a patient to a "healthcare service" in which the practitioner has a "significant beneficial interest". See N.J.S.A. 45:9–22.5.

351.    However – and again, as set forth above – the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

See id.

352.    What is more, pursuant to the ASC Exception described above, the Codey Law's restrictions on patient referrals also do not apply to "ambulatory surgery or procedures requiring anesthesia performed at a surgical practice registered with the Department of Health . . . or at an ambulatory care facility licensed by the Department of Health to perform surgical and related services or lithotripsy services", provided that – among other things – the practitioner who provided the referral "personally performs the procedure". See id.

353.    Zaitsev, Weissman, and Gorman – as licensed physicians – were "practitioners" as defined by the Codey Law. See N.J.S.A. 45:9–22.4.

354.    Interstate and Highland were "healthcare services", in that they were "business entit[ies] which provide[d] on an inpatient or outpatient basis: … diagnosis or treatment of human disease or dysfunction … ." Id.

355.    In the context of the Codey Law, Zaitsev – who owned Interstate and Highland – had a "significant beneficial interest" in Interstate and Highland. Id.

356.    In the context of the Codey Law, Weissman and Gorman were Zaitsev's employees at Interstate and Highland, and also had "significant beneficial interests" in Interstate and Highland.

357.    In the context of the Codey Law, virtually all of the pain management injections in the claims identified in Exhibits "1" and "2" were performed at Accelerated Surgery Center, an ambulatory surgical center "licensed by the Department of Health and Senior Services to perform surgical and related services."

358.    In virtually every claim for pain management injections identified in Exhibits "1" and "2", Zaitsev, Weissman, or Gorman would examine the Insured at Interstate or Highland's offices, and then self–refer the Insured to Interstate or Highland for the pertinent injections, which were performed at an ambulatory surgical center, not at Interstate or Highland's offices.

359.    All of the referrals from Zaitsev, Weissman, and Gorman to Interstate and Highland for the pain management injections identified in Exhibits "1" and "2" violated the Codey Law, because: (i) none of the referrals qualified for the ASC Exception, because the pain management injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; and (ii) the pain management injections were performed at Accelerated Surgery Center, rather than at Zaitsev, Weissman, Gorman, Interstate, or Highland's  medical office.

360.    As a result, the exception to the Codey Law for "medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office" did not apply to self–referrals to Interstate and Highland for pain management injections.

361.    What is more, the ASC Exception to the Codey Law did not apply to the self– referrals to Interstate and Highland for pain management injections, because the pain management injections did not legitimately require anesthesia.

362.     In a legitimate clinical setting, pain management injections such as epidural injections, facet injections, arthrocentesis injections, and diskography injections generally do not require sedation or other forms of anesthesia.

363.    Indeed, according to a recent review of the literature published in Pain Physician, the official journal of the American Society of Interventional Pain Physicians, "[m]ost practice guidelines discourage the routine use of sedation for interventional pain procedures." See NS,

Howard, M.D., <u>Evaluation of Intravenous Sedation on Diagnostic Spinal Injection Procedures</u>, Pain Physician 2013.

364.    Even so, Zaitsev, Weissman, and Gorman routinely and unlawfully self–referred Insureds to Interstate and Highland for pain management injections performed at Accelerated Surgery Center, which they then billed to GEICO through Interstate or Highland.

365.    For example:

(i)    On or about April 3, 2013, Weissman – at Zaitsev's direction – self–referred an Insured named SH to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on April 17, 2013 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(ii)   On or about April 3, 2013, Weissman – at Zaitsev's direction – self–referred an Insured named BK to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on April 17, 2013 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(iii)  On or about April 15, 2013, Zaitsev self–referred an Insured named JE to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on May 8, 2013 at Accelerated Surgical Center, rather than at Zaitsev or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev and Highland billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(iv)   On or about May 10, 2013, Weissman – at Zaitsev's direction – self–referred an Insured named CD to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on May 22, 2013 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Highland's medical office, and therefore did not qualify for

the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(v)    On or about August 13, 2013, Zaitsev self–referred an Insured named SL to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on August 28, 2013 at Accelerated Surgical Center, rather than at Zaitsev or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev and Highland billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(vi)   On or about August 21, 2013, Zaitsev self–referred an Insured named WF to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on September 4, 2013 at Accelerated Surgical Center, rather than at Zaitsev or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(vii)  On or about November 13, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named SW to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on December 23, 2013 at Accelerated Surgical Center, rather than at Zaitsev, Gorman, or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Gorman, and Highland billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(viii) On or about December 11, 2013, Weissman – at Zaitsev's direction – self–referred an Insured named AH to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on January 8, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(ix)   On or about December 18, 2013, Zaitsev self–referred an Insured named AL to Highland for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on

January 8, 2014 at Accelerated Surgical Center, rather than at Zaitsev or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(x)     On or about January 31, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named AF to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on February 26, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xi)    On or about April 17, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named SE to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on May 7, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xii)   On or about May 15, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named  DC to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on May 21, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman, and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(xiii)  On or about July 28, 2014, Gorman – at Zaitsev's direction – self–referred an Insured named MF to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on August 13, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Gorman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Gorman, and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xiv)   On or about September 8, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named ED to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on September 24, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xv)   On or about September 22, 2014, Zaitsev self–referred an Insured named SC to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on October 8, 2014 at Accelerated Surgical Center, rather than at Zaitsev or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xvi)   On or about October 28, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named DC to Interstate for facet joint injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed on November 12, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman, and Interstate billed GEICO $9,975.00 for the injection, which was the product of an illegal self–referral.

(xvii)   On or about November 18, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named ME to Interstate for facet joint injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed on December 3, 2014 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman, and Interstate billed GEICO $10,675.00 for the injection, which was the product of an illegal self–referral.

(xviii)   On or about December 19, 2014, Weissman – at Zaitsev's direction – self–referred an Insured named JC to Interstate for facet joint injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed on January 7, 2015 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman,

111

and Interstate billed GEICO $9,975.00 for the injection, which was the product of an illegal self–referral.

(xix)   On or about March 11, 2015, Weissman – at Zaitsev's direction – self–referred an Insured named LG to Highland for facet joint injections that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injections were performed on March 25, 2015 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Highland's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev and Highland billed GEICO $9,975.00 for the injections, which were the product of an illegal self–referral.

(xx)    On or about August 24, 2015, Weissman – at Zaitsev's direction – self–referred an Insured named JD to Interstate for an epidural injection that did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia". The injection was performed on September 17, 2015 at Accelerated Surgical Center, rather than at Zaitsev, Weissman, or Interstate's medical office, and therefore did not qualify for the Codey Law's exception for "medical treatment or a procedure that is provided at the practitioner's medical office". Even so, Zaitsev, Weissman and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

366.    These are only representative samples of the Defendants' illegal self–referrals for pain management injections. Virtually all of the pain management injections in the claims identified in Exhibits "1" and "2" were the product of illegal self–referrals, inasmuch as: (i) none of the referrals qualified for the ASC Exception, because the pain management injections did not legitimately qualify as "ambulatory surgery or procedures requiring anesthesia"; and (ii) the pain management injections were performed at Accelerated Surgery Center, rather than at Zaitsev's medical office.

367.    Even if the pain management injections identified in Exhibits "1" and "2" did qualify as "ambulatory surgery or procedures requiring anesthesia", the ASC Exception does not apply unless, among other things, "the practitioner who provided the referral personally performs the procedure."

368.   Even so, in many of the claims for pain management injections identified in Exhibits "1" and "2", practitioners other than those who provided the referral purported to perform the pain management injections at Accelerated Surgery Center.

369.   For example:

(i)   On or about April 1, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named JL to Highland for an epidural injection. The injection was performed on April 24, 2013 at Accelerated Surgical Center by Zaitsev, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(ii)   On or about May 14, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named LM to Highland for an epidural injection. The injection was performed on June 12, 2013 at Accelerated Surgical Center by Zaitsev, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(iii)   On or about May 16, 2013, Zaitsev self–referred an Insured named TD to Highland for an epidural injection. The injection was performed on May 29, 2013 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(iv)   On or about June 25, 2013, Weissman – at Zaitsev's direction – self–referred an Insured named RM to Highland for an epidural injection. The injection was performed on September 18, 2013 at Accelerated Surgery Center by Zaitsev, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(v)   On or about June 27, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named MC to Highland for an epidural injection. The injection was performed on July 17, 2013 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(vi)     On or about August 20, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named LM to Highland for an epidural injection. The injection was performed on September 4, 2013 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(vii)    On or about August 22, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named BM to Highland for an epidural injection. The injection was performed on October 16, 2013 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(viii)   On or about August 28, 2013, Zaitsev self–referred an Insured named ED to Highland for facet joint injections. The injections were performed on September 11, 2013 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as they were not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Highland billed GEICO $9,975.00 for the injections, which were the product of an illegal self–referral.

(ix)     On or about November 21, 2013, Gorman – at Zaitsev's direction – self–referred an Insured named AC to Highland for an epidural injection. The injection was performed on December 11, 2013 at Accelerated Surgical Center by Zaitsev, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Highland billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(x)      On or about January 27, 2014, Gorman – at Zaitsev's direction – self–referred an Insured named MC to Highland for an epidural injection. The injection was performed on February 12, 2014 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Highland billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xi)     On or about March 14, 2014, Gorman – at Zaitsev's direction – self–referred an Insured named MD to Interstate for an epidural injection. The injection was performed on April 2, 2014 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev,

Weissman, and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xii)    On or about March 20, 2014, Ciccone – at Zaitsev's direction – self–referred an Insured named AF to Interstate for an epidural injection. The injection was performed on March 26, 2014 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xiii)   On or about July 28, 2014, Gorman – at Zaitsev's direction – self–referred an Insured named MF to Interstate for an epidural injection. The injection was performed on August 13, 2014 at Accelerated Surgical Center by Zaitsev, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Interstate billed GEICO $3,050.00 for the injection, which was the product of an illegal self–referral.

(xiv)   On or about August 21, 2014, Gorman – at Zaitsev's direction – self–referred an Insured named JG to Interstate for an epidural injection. The injection was performed on October 1, 2014 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(xv)    On or about October 23, 2014, Ciccone – at Zaitsev's direction – self–referred an Insured named EG to Interstate for an epidural injection. The injection was performed on December 23, 2014 at Accelerated Surgical Center by Gorman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Gorman, and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(xvi)   On or about October 23, 2014, Ciccone – at Zaitsev's direction – self–referred an Insured named CM to Interstate for an epidural injection. The injection was performed on October 29, 2014 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(xvii)  On or about November 17, 2014, Ciccone – at Zaitsev's direction – self–referred an Insured named EG to Interstate for an epidural injection. The injection was performed on December 3, 2014 at Accelerated Surgical Center by Zaitsev, and

therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(xviii) On or about November 17, 2014, Ciccone – at Zaitsev's direction – self–referred an Insured named JM to Interstate for facet joint injections. The injections were performed on November 19, 2014 at Accelerated Surgical Center by Weissman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Weissman, and Interstate billed GEICO $9,975.00 for the injection, which was the product of an illegal self–referral.

(xix) On or about July 29, 2015, Weissman – at Zaitsev's direction – self–referred an Insured named MF to Interstate for an epidural injection. The injection was performed on September 24, 2015 at Accelerated Surgical Center by Zaitsev, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

(xx) On or about December 8, 2015, Weissman – at Zaitsev's direction – self–referred an Insured named RM to Interstate for an epidural injection. The injection was performed on December 30, 2015 at Accelerated Surgical Center by Gorman, and therefore did not qualify for the ASC Exception, as it was not personally performed by the practitioner who provided the referral. Even so, Zaitsev, Gorman, and Interstate billed GEICO $2,850.00 for the injection, which was the product of an illegal self–referral.

370. These are only representative examples of the Defendants' illegal self-referrals for pain management injections. Virtually all of the pain management injections in the claims identified in Exhibits "1" and "2" were the product of illegal self-referrals, inasmuch as: (i) none of the referrals qualified for the ASC Exception, because the pain management injections did not qualify as "ambulatory surgery or procedures requiring anesthesia"; (ii) the pain management injections were performed at Accelerated Surgical Center or at some other ambulatory care facility, rather than at Zaitsev's medical office; and/or (iii) the practitioners who made the referrals for the pain management injections did not personally perform the resulting procedures.

116

2.      **The Medically Unnecessary Anesthesia Services at Interstate**

371.    As set forth above, and in Exhibit "1", the Defendants routinely submitted separate charges for anesthesia services – in particular sedation – through Interstate, together with the charges for the medically unnecessary pain management injections.

372.    Gorman or Copeland purported to perform the vast majority of anesthesia services at Interstate, which were then billed to GEICO using CPT code 01992, typically resulting in a charge of between $1,750.00 and $2,100.00 for each round of anesthesia services that purportedly was provided.

373.    In an attempt to legitimize their illegal self-referrals for pain management injections, the Defendants subjected every Insured receiving pain management injections to medically unnecessary anesthesia services.

374.    Zaitsev, Weissman, Gorman, Copeland, and Interstate knew that, in order to qualify for the ASC Exception to the Codey Law, their self-referrals needed to be for "ambulatory surgery or procedures requiring anesthesia."

375.    However, and as set forth above, in a legitimate clinical setting, pain management injections such as epidural injections and facet injections generally do not require sedation or other forms of anesthesia.

376.    In fact, the American Society of Anesthesiologists – in which both Zaitsev and Gorman claim membership – has specified that "the majority of minor pain procedures, under most routine circumstances, do not require anesthesia care other than local anesthesia. Such procedures include epidural steroid injections, epidural blood patch, trigger point injections, sacroiliac joint injections, bursal injections, occipital nerve block and facet injections." See

117

American Society of Anesthesiologists, "Statement on Anesthetic Care during Interventional Pain Procedures for Adults", October 20, 2010.

377.    Sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

378.    Not only can sedation itself induce adverse events, including death, but patients receiving pain management injections should remain awake and alert to warn the treating physician of adverse events relating to the underlying injections.

379.    Nonetheless, in order to create the appearance that the self-referred, routine pain management injections were, in fact, "procedures requiring anesthesia", Zaitsev, Gorman, Copeland, and Interstate subjected every Insured receiving pain management injections to medically unnecessary anesthesia services.

380.    Zaitsev, Gorman, and Copeland – who purported to provide virtually all of the anesthesia services that were billed through Interstate to GEICO in the claims identified in Exhibit "1" – were well-aware of the fact that sedation generally is unwarranted in the context of interventional pain procedures such as pain management injections because the risk attendant to sedation outweighs any prospective benefit to the patient.

381.    Even so, Zaitsev, Gorman, and Copeland routinely administered sedation to the Insureds in the claims identified in Exhibit "1" because it was part of the Defendants' fraudulent treatment and billing protocol, and because they wanted to continue profiting from the Defendants' fraudulent scheme.

382.    Each and every one of the anesthesia services attendant to pain management injections that are identified in Exhibit "1" was medically unnecessary, in that the anesthesia

services: (i) were provided, to the extent that they were provided at all, primarily for the benefit of the Defendants, and not to treat or otherwise benefit the Insureds; and (ii) were not the most appropriate standard of level of service in accordance with standards of good practice and standard professional treatment protocols.

**3.      Basic, Legitimate Use of Pain Management Injections**

383.    Like the charges for the other Fraudulent Services, the charges for the pain management injections were fraudulent in that the pain management injections were medically unnecessary and were provided pursuant to the phony "diagnoses" that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland provided to the Insureds at the conclusion of the putative initial and follow–up examinations.

384.    Moreover, in the claims for pain management injections identified in Exhibits "1" and "2", the charges for the pain management injections were fraudulent in that they misrepresented Interstate and Highland's eligibility to collect PIP Benefits in the first instance.

385.    In fact, Interstate and Highland never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because – as a result of the fraudulent scheme described herein – neither they nor the injections were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

386.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

387.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

388.   The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four–week mark.

389.   In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

390.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive pain management injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

391.   In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered contemporaneously.

392.   This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**4.      The Medically Unnecessary Pain Management Injections**

393.    However, in the claims for pain management injections identified in Exhibits "1" and "2", Zaitsev, Weissman, Gorman, Interstate, and Highland routinely purported to administer multiple pain management injections to Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

394.    For example:

(i)      On April 17, 2013, Zaitsev, Weissman, and Highland purported to provide an Insured named SD with an epidural injection. Zaitsev, Weissman, and Highland purported to provide SD with additional epidural injections on May 1, 2013 and May 15, 2013. Then, just two weeks later, on May 29, 2013, Zaitsev, Weissman, and Highland purported to provide SD with three facet joint injections. Then, on July 3, 2013, Zaitsev, Weissman, and Highland purported to provide SD with three more facet joint injections, for a total of <u>nine</u> medically unnecessary pain management injections over the course of less than three months.

(ii)     On May 1, 2013, Zaitsev and Highland purported to provide an Insured named MA with three facet joint injections. Then, on June 5, 2013, Zaitsev and Highland purported to provide MA with three more facet joint injections. Then, just three weeks later, on June 26, 2013, Zaitsev and Highland purported to provide MA with six more facet joint injections, for a total of <u>12</u> medically unnecessary pain management injections over the course of less than two months.

(iii)    On May 8, 2013, Zaitsev and Highland purported to provide an Insured named BH with two facet joint injections. Then, just two weeks later, on May 22, 2013, Zaitsev and Highland purported to provide BH with two more facet joint injections. Then, just two weeks later, on June 5, 2013, Weissman, Zaitsev, and Highland purported to provide BH with three more facet joint injections. Then, two weeks later, on June 19, 2013, Zaitsev and Highland purported to provide BH with three more facet joint injections. Then, on July 24, 2013, Zaitsev and Highland purported to provide BH with yet three more facet joint injections, for a total of <u>13</u> medically unnecessary pain management injections over the course of less than three months.

(iv)    On July 10, 2013, Weissman, Zaitsev, and Highland purported to provide an Insured named DS with three facet joint injections. Then, just two weeks later, on July 24, 2013, Zaitsev and Highland purported to provide DS with three more facet joint injections. Then, two weeks later, on August 7, 2013, Weissman, Zaitsev, and Highland purported to provide DS with three more facet joint

injections. Then, Weissman, Zaitsev, and Highland purported to provide DS with epidural injections on September 4, 2013, September 18, 2013, and October 2, 2013, for a total of 12 medically unnecessary pain management injections over the course of less than four months.

(v)  On July 10, 2013, Zaitsev and Highland purported to provide an Insured named MB with an epidural injection. Then, just three weeks later, on July 31, 2013, Weissman, Zaitsev, and Highland purported to provide MB with another epidural injection. Then, just two weeks later, on August 14, 2013, Weissman, Zaitsev, and Highland purported to provide MB with three facet joint injections. Then, on September 4, 2013, Zaitsev and Highland purported to provide MB with three additional facet joint injections. Then, just two weeks later, on September 18, 2013, Zaitsev and Highland purported to provide MB with three more facet joint injections, for a total of 11 medically unnecessary pain management injections over the course of two months.

(vi)  On July 10, 2013, Zaitsev and Highland purported to provide an Insured named ME with an epidural injection. Just two weeks later, on July 24, 2013, Zaitsev and Highland purported to provide ME with three facet joint injections. Then, on August 7, 2013, Zaitsev and Highland purported to provide ME with three more facet joint injections. Then, just three weeks later, on August 28, 2013, Zaitsev and Highland purported to provide ME with yet three more facet joint injections, for a total of ten medically unnecessary pain management injections over the course of less than two months.

(vii)  On February 12, 2014, Zaitsev, Weissman, and Highland purported to provide an Insured named MC with an epidural injection. Then, two weeks later, on February 26, 2014, Zaitsev, Weissman, and Highland purported to provide MC with an additional epidural injection. Then, on March 12, 2014, Zaitsev, Weissman, and Highland purported to provide MC with yet another epidural injection. Then, just two weeks later, on March 26, 2014, Zaitsev, Weissman, and Highland purported to provide MC with three facet joint injections. Then, on April 16, 2014, Zaitsev, Gorman, and Highland purported to provide MC with three more epidural injections, for a total of nine medically unnecessary pain management injections over the course of two months.

(viii)  On March 5, 2014, Zaitsev, Weissman, and Interstate purported to provide an Insured named MG with an epidural injection. Zaitsev, Weissman, and Interstate purported to provide MG with additional epidural injections on April 2, 2014 and April 23, 2014. Then, just two weeks later, on May 7, 2014, Zaitsev, Weissman, and Interstate purported to provide MG with three facet joint injections. Then, two weeks later, on May 21, 2014, Zaitsev and Interstate purported to provide MG with three more facet joint injections. Then, on June 4, 2014, Zaitsev and Interstate purported to provide MG with yet three more facet joint injections, for a total of 12 medically unnecessary pain management injections over the course of three months.

(ix)     On May 21, 2014, Zaitsev, Weissman, and Interstate purported to provide an Insured named DC with an epidural injection. Then, on June 11, 2014, Zaitsev and Interstate purported to provide DC with an additional epidural injection. Just two weeks later, on June 25, 2014, Zaitsev, Weissman, and Interstate purported to provide DC with yet another epidural injection. Then, on July 9, 2014, Zaitsev and Interstate purported to provide DC with six facet joint injections, for a total of nine medically unnecessary pain management injections over the course of less than two months.

(x)      On October 1, 2014, Zaitsev, Weissman, and Interstate purported to provide an Insured named JG with an epidural injection. Then, on October 29, 2014, Zaitsev, Weissman, and Interstate purported to provide JG with an additional epidural injection. Then, on November 26, 2014, Zaitsev, Weissman, and Interstate purported to provide JG with three facet joint injections. Then, on December 17, 2014, Zaitsev, Weissman, and Interstate purported to provide JG with three facet joint injections. Then, on January 7, 2015, Zaitsev, Weissman, and Interstate purported to provide JG with yet three more facet joint injections, for a total of 11 medically unnecessary pain management injections over the course of three months.

(xi)     On January 7, 2015, Zaitsev, Weissman, and Intestate purported to provide an Insured named JC with three facet joint injections. Just three weeks later, on January 21, 2015, Zaitsev, Weissman, and Interstate purported to provide JC with three more facet joint injections. Then, on February 11, 2015, Zaitsev, Weissman, and Interstate purported to provide JC with six more facet joint injections. Just two weeks later, on February 25, 2015, Zaitsev, Weissman, and Interstate purported to provide JC with three more facet joint injections. Then, on March 11, 2015, Zaitsev, Weissman, and Interstate purported to provide JC with three more facet joint injections. Then, on March 25, 2015, Zaitsev, Weissman, and Interstate purported to provide JC with yet three more facet joint injections, for a total of 21 medically unnecessary pain management injections over the course of less than three months.

(xii)    On April 1, 2015, Zaitsev, Gorman, and Intestate purported to provide an Insured named MB with three facet joint injections. Just two weeks later, on April 15, 2015, Zaitsev and Interstate purported to provide MB with three more facet joint injections. Then, two weeks later, Zaitsev, Weissman, and Interstate purported to provide MB with three more facet joint injections. Then, Zaitsev, Weissman, and Interstate purported to provide MB with epidural injections on May 20, 2015, June 3, 2015, and June 17, 2015, for a total of 12 medically unnecessary pain management injections over the course of just two months.

(xiii)   Zaitsev, Weissman, and Interstate purported to provide an Insured named JC with epidural injections on June 29, 2015, July 13, 2015, July 27, 2015, August 10, 2015, August 27, 2015, and September 10, 2015. Then, on September 24, 2015,

123

Zaitsev, Weissman, and Interstate purported to provide JC with three facet joint injections, for a total of <u>nine</u> medically unnecessary pain management injections over the course of less than three months.

(xiv) On November 25, 2015, Zaitsev and Interstate purported to provide an Insured named SG with three facet joint injections. Then, on December 16, 2015, Zaitsev and Interstate purported to provide SG with three more facet joint injections. Then, on January 7, 2016, Zaitsev, Weissman, and Interstate purported to provide SG with three additional facet joint injections. Zaitsev, Weissman, and Interstate purported to provide SG with epidural injections on February 4, 2016 and February 18, 2016, for a total of <u>11</u> medically unnecessary pain management injections over the course of less than three months.

(xv) On November 9, 2016, Zaitsev, Gorman, and Interstate purported to provide an Insured named FB with an epidural injection. Just two weeks later, on November 23, 2016, Zaitsev and Interstate again purported to provide FB with an epidural injection. Two weeks later, Zaitsev, Weissman, and Interstate purported to provide FB with yet another epidural injection. Two weeks later, on December 7, 2016, Zaitsev, Weissman, and Interstate purported to provide FB with three facet joint injections. Then, on January 11, 2017, Zaitsev, Weissman, and Interstate purported to provide FB with three more facet joint injections, for a total of <u>nine</u> medically unnecessary pain management injections over the course of just two months.

395.    As set forth above, virtually all of the Insureds in the claims identified in Exhibits "1" and "2" were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

396.    To the limited extent that the Insureds in the claims identified in Exhibits "1" and "2" experienced any injuries at all in their minor accidents, the injuries were minor soft tissue injuries such as sprains and strains.

397.    By the time the Insureds in the claims identified in Exhibits "1" and "2" presented to Zaitsev, Weissman, Ciccone, Gorman, Reiter, Interstate, and Highland for treatment, they either had no presenting problems at all, or their presenting problems consisted of trivial sprains and strains that were in the process of being resolved through conservative treatment.

398.    Even so, in the claims for pain management injections identified in Exhibits "1"

and "2", Zaitsev, Weissman, Gorman, Interstate, and Highland routinely purported to administer pain management injections to Insureds who did not require them, long after any minor soft tissue injuries that may have sustained in their minor accidents would have resolved.

399.   For example:

(i)   On October 1, 2012, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured and did not complain of any pain at the scene. In keeping with the fact that SP was not injured, she did not visit any hospital following the accident. To the extent that SP experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within seven months of the accident. Even so, Zaitsev and Highland purported to provide SP with medically unnecessary facet joint and epidural injections on June 12, 2013, June 26, 2013, July 10, 2013, July 24, 2013, August 28, 2013, September 11, 2013, September 25, 2013, October 9, 2013, October 23, 2013, and March 25, 2015, between eight and eighteen months after SP's minor accident.

(ii)   On October 4, 2012, an Insured named SH was involved in a minor automobile accident. In keeping with the fact that SH was not injured, she did not visit any hospital following the accident. To the extent that SH experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within six months of the accident. Even so, Zaitsev, Weissman, and Highland purported to provide SH with medically unnecessary epidural injections on April 17, 2013 and May 1, 2013, more than six months after SH's minor accident.

(iii)   On November 4, 2012, an Insured named WF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WF's vehicle was drivable following the accident. The police report further indicated that WF was not injured and did not complain of any pain at the scene. In keeping with the fact that WF was not injured, he did not visit any hospital following the accident. To the extent that WF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within ten months of the minor accident. Even so, Zaitsev and Highland purported to provide WF with a medically unnecessary epidural injection on September 4, 2013 – ten months after WF's minor accident. Then, Zaitsev and Highland purported to provide WF with additional epidural injections on September 18, 2013 and October 2, 2013 – more than ten months after the minor accident – none of which was medically necessary.

(iv)  On December 14, 2012, an Insured named IF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IF's vehicle was drivable following the accident. The police report further indicated that IF was not injured and did not complain of any pain at the scene. In keeping with the fact that IF was not injured, he did not visit any hospital following the accident. To the extent that IF experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, Zaitsev, Weissman, and Highland purported to provide IF with medically unnecessary epidural injections on May 1, 2013 and June 5, 2013, more than five months after SH's minor accident.

(v)  On March 5, 2013, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured and did not complain of any pain at the scene. In keeping with the fact that MJ was not injured, she did not visit any hospital following the accident. To the extent that MJ experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the accident. Even so, Zaitsev and Highland purported to provide MJ with a medically unnecessary epidural injection on July 17, 2013, more than four months after MJ's minor accident.

(vi)  On March 5, 2013, an Insured named EV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EV's vehicle was drivable following the accident. The police report further indicated that EV was not injured and did not complain of any pain at the scene. In keeping with the fact that EV was not injured, he did not visit any hospital following the accident. To the extent that EV experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the accident. Even so, Zaitsev, Weissman, and Highland purported to provide EV with a medically unnecessary epidural injections on July 17, 2013 and July 31, 2013, more than four months after EV's minor accident.

(vii)  On March 5, 2013, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not injured, she did not visit any hospital following the accident. To the extent that MC experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the accident. Even so, Zaitsev, Weissman, and Highland purported to

126

provide MC with medically unnecessary epidural injections on July 17, 2013, July 31, 2013, and August 14, 2013 more than five months after MC's minor accident.

(viii)    On May 8, 2013, an Insured named EL was involved in a minor automobile accident. In keeping with the fact that EL not injured, she did not visit any hospital following the accident. To the extent that EL experienced any health problems at all as the result of the minor accident, they were of low severity, and had completely resolved within three months of the accident. Even so, Zaitsev, Weissman, and Highland purported to provide EL with medically unnecessary epidural injections on August 7, 2013 and August 21, 2013, more than three months after EL's minor accident.

(ix)    On July 2, 2013, an Insured named SW was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SW's vehicle was drivable following the accident. The police report further indicated that SW was not injured and did not complain of any pain at the scene. In keeping with the fact that SW was not injured, she did not visit any hospital following the accident. To the extent that SW experienced any health problems at all as the result of the minor accident, they were of low severity, and had completely resolved within four months of the accident. Even so, Weissman, Zaitsev, and Highland purported to provide SW with medically unnecessary epidural injections on November 27, 2013 and December 23, 2013, more than five months after SW's minor accident.

(x)    On July 15, 2013, an Insured named HY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HY's vehicle was drivable following the accident. The police report further indicated that HY was not injured and did not complain of any pain at the scene. In keeping with the fact that HY was not injured, she did not visit any hospital following the accident. To the extent that HY experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the accident. Even so, Zaitsev, Weissman, and Interstate purported to provide HY with medically unnecessary facet joint injections on January 8, 2014 and February 11, 2014 – more than six months after HY's minor accident.

(xi)    On August 12, 2013, an Insured named DP was involved in a minor automobile accident. In keeping with the fact that DP not injured, she did not visit any hospital following the accident. To the extent that DP experienced any health problems at all as the result of the minor accident, they were of low severity, and had completely resolved within four months of the accident. Even so, Zaitsev, Weissman, and Highland purported to provide DP with medically unnecessary epidural injections on December 18, 2013, January 8, 2014, and January 29, 2014, more than five months after DP's minor accident.

(xii)    On October 14, 2013, an Insured named JB was involved in a minor automobile accident. In keeping with the fact that JB was not injured, he did not visit any hospital following the accident. To the extent that JB experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within nine months of the accident. Even so, Zaitsev, Gorman, and Interstate purported to provide JB with medically unnecessary epidural injections on July 16, 2014 and August 4, 2014, more than nine months after JB's minor accident.

(xiii)    On October 14, 2013, an Insured named ML was involved in a minor automobile accident. In keeping with the fact that ML was not injured, she did not visit any hospital following the accident. To the extent that ML experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within eight months of the accident. Even so, Zaitsev, Weissman, and Highland purported to provide ML with a medically unnecessary epidural injection on July 9, 2014 – more than eight months after ML's minor accident.

(xiv)    On October 14, 2014, an Insured named WJ was involved in an automobile accident. The contemporaneous police report indicated that the accident as a low-speed, low-impact collision. The police report further indicated that, although WJ complained of an arm abrasion, he refused medical attention at the scene. In keeping with the fact that WJ was not injured, he did not visit any hospital following the accident. To the extent that WJ experienced any health problems at all as the result of the minor accident, they were of low severity, and had completely resolved within four months of the accident. Even so, Zaitsev, Weissman, and Interstate purported to provide WJ with medically unnecessary pain management injections on February 25, 2015, March 25, 2015, April 8, 2015, April 14, 2015, April 29, 2015, May 13, 2015, May 27, 2015, July 21, 2015, and August 4, 2015, between four and ten months after WJ's minor accident.

(xv)    On October 27, 2014, an Insured named NV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that NV's vehicle was drivable following the accident. The police report further indicated that NV was not injured and did not complain of any pain at the scene. In keeping with the fact that NV was not injured, she did not visit any hospital following the accident. To the extent that NV experienced any health problems at all as the result of the minor accident, they were of low severity and had completely resolved within five months of the accident. Even so, Zaitsev, Weissman, and Interstate purported to provide NV with medically unnecessary facet joint injections of April 9, 2015 and April 30, 2015, more than six months after NV's minor accident.

(xvi)    On April 22, 2015, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

low-impact collision. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not injured, he did not visit any hospital following the accident. To the extent that JR experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within one year of the minor accident. Even so, Zaitsev and Interstate purported to provide JR with medically unnecessary facet joint injections on May 11, 2016 – more than one year after JR's minor accident.

(xvii)   On January 11, 2016, an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CR's vehicle was drivable following the accident. The police report further indicated that CR was not injured and did not complain of any pain at the scene. In keeping with the fact that CR was not injured, he did not visit any hospital following the accident. To the extent that CR experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the minor accident. Even so, Zaitsev, Weissman, and Interstate purported to provide CR with a medically unnecessary epidural injection on June 24, 2016 – more than five months after CR's minor accident.

(xviii)  On January 11, 2016, an Insured named JO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that JO was not injured and did not complain of any pain at the scene. In keeping with the fact that JO was not injured, she did not visit any hospital following the accident. To the extent that JO experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, Zaitsev, Weissman, and Interstate purported to provide JO with medically unnecessary facet joint injections on June 1, 2016 –five months after JO's minor accident.

(xix)    On January 11, 2016, an Insured named AV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that AV's vehicle was drivable following the accident. The police report further indicated that AV was not injured and did not complain of any pain at the scene. In keeping with the fact that AV was not injured, she did not visit any hospital following the accident. To the extent that AV experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within five months of the accident. Even so, Zaitsev, Weissman, and Interstate purported to provide AV with medically unnecessary epidural and facet joint injections on June 24 ,2016 and August 10, 2016, between five and seven months after AV's minor accident.

(xx)    On February 27, 2016, an Insured named CT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision. The police report further indicated that CT was not injured and did not complain of any pain at the scene. In keeping with the fact that CT was not injured, he did not visit any hospital following the accident. To the extent that CT experienced any health problems at all as the result of the minor accident, they were of low severity at the outset, and had completely resolved within four months of the minor accident. Even so, Zaitsev, Weissman, and Interstate purported to provide CT with medically unnecessary facet joint injections on June 15, 2016 – four months after CT's minor accident.

**5.    Misrepresentations Regarding the Reimbursable Amount for the Pain Management Injections**

400.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

401.    Not only did Zaitsev, Weissman, Gorman, Interstate, and Highland routinely bill GEICO for medically unnecessary pain management injections, they also routinely misrepresented the reimbursable amount for the pain management injections.

402.    Specifically, and as set forth above and in Exhibits "1" and "2", Zaitsev, Weissman, Gorman, Interstate, and Highland billed virtually all of their purported pain management injections under CPT codes 62310, 62311, 64490, 64491, 64492, 64493, 64494, and 64495.

403.    The following chart sets forth the maximum reimbursable amount under the Fee Schedule for pain management injections under those CPT codes, as well as the unlawfully inflated charges that Zaitsev, Weissman, Gorman, Interstate, and Highland submitted under those codes through Interstate and Highland to GEICO:

| CPT Code | Procedure Description | Fee Schedule Amount | Interstate/Highland Billed Amount |
|---|---|---|---|
| 62310 | INJECT SPINE C/T | $1,021.73 | $3,050.00 |
| 62311 | INJECT SPINE L/S (CD) | $879.37 | $2,850.00 |

| 64479 | INJECT FORAMEN EPIDURAL C/T | $670.71 | $3,050.00 |
| 64480 | INJECT FORAMEN EPIDURAL, ADDED | $397.14 | $1,525.00 |
| 64490 | INJECT PARAVERT F JNT C/T 1 LEV | $494.93 | $6,100.00 |
| 64491 | INJECT PARAVERT F JNT C/T 2 LEV | $241.80 | $3,050.00 |
| 64492 | INJECT PARAVERT F JNT C/T 3 LEV | $244.49 | $1,525.00 |
| 64493 | INJECT PARAVERT F JNT L/S 1 LEV | $442.52 | $5,700.00 |
| 64494 | INJECT PARAVERT F JNT L/S 2 LEV | $218.85 | $2,850.00 |
| 64495 | INJECT PARAVERT F JNT L/S 3 LEV | $222.43 | $1,425.20 |
| 72275 | EPIDUROGRAPHY | $572.81 | $1,600.00 |
| 77003 | FLUOROGUIDE FOR SPINE INJECT | $236.32 | $950.00 |

404.    For example:

(i)     Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $5,700.00 under CPT code 64493 for a pain management injection they purported to provide to an Insured named JB on March 27, 2013;

(ii)    Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $2,850.00 under CPT code 64494 for a pain management injection they purported to provide to an Insured named CV on May 15, 2013;

(iii)   Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $1,425.20 under CPT code 64495 for a pain management injection they purported to provide to an Insured named CV on May 15, 2013;

(iv)    Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $3,050.00 under CPT code 64479 for a pain management injection they purported to provide to an Insured named CV on September 25, 2013;

(v)     Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $3,050.00 under CPT code 64480 for a pain management injection they purported to provide to an Insured named CV on September 25, 2013;

(vi)    Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $3,050.00 under CPT code 62310 for a pain management injection they purported to provide to an Insured named SW on December 23, 2013;

(vii)   Weissman, Zaitsev, and Highland submitted an unlawfully inflated charge of $2,850.00 under CPT code 62311 for a pain management injection they purported to provide to an Insured named AC on December 30, 2013;

(viii)  Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $6,100.00 under CPT code 64490 for a pain management injection they purported to provide to an Insured named MC on April 16, 2014;

(ix)     Gorman, Zaitsev, and Highland submitted an unlawfully inflated charge of $1,525.00 under CPT code 64492 for a pain management injection they purported to provide to an Insured named MC on April 16, 2014;

(x)      Weissman, Zaitsev, and Highland submitted an unlawfully inflated charge of $3,050.00 under CPT code 64491 for a pain management injection they purported to provide to an Insured named ML on June 25, 2014;

(xi)     Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $1,525.00 under CPT code 64492 for a pain management injection they purported to provide to an Insured named RA on February 17, 2016;

(xii)    Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $1,425.20 under CPT code 64495 for a pain management injection they purported to provide to an Insured named AH on February 17, 2016;

(xiii)   Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $6,100.00 under CPT code 64490 for a pain management injection they purported to provide to an Insured named KJ on February 18, 2016;

(xiv)    Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $3,050.00 under CPT code 64491 for a pain management injection they purported to provide to an Insured named KJ on February 18, 2016;

(xv)     Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $3,050.00 under CPT code 62310 for a pain management injection they purported to provide to an Insured named JA on March 9, 2016;

(xvi)    Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $3,050.00 under CPT code 64479 for a pain management injection they purported to provide to an Insured named DC on March 15, 2016;

(xvii)   Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $3,050.00 under CPT code 64480 for a pain management injection they purported to provide to an Insured named DC on March 15, 2016;

(xviii)  Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $2,850.00 under CPT code 62311 for a pain management injection they purported to provide to an Insured named TD on March 30, 2016;

(xix)    Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $5,700.00 under CPT code 64493 for a pain management injection they purported to provide to an Insured named GP on March 30, 2016; and

(xx)   Weissman, Zaitsev, and Interstate submitted an unlawfully inflated charge of $2,850.00 under CPT code 64494 for a pain management injection they purported to provide to an Insured named GP on March 30, 2016.

405.   Each and every one of Defendants' inflated  charges for the pain management injections identified in Exhibits "1" and "2" constitutes a separate violation of N.J.S.A. § 39:6A-4.6(c).

406.   The Defendants knowingly submitted charges through Interstate and Highland in gross excess of the amounts allowed under the Fee Schedule in order to maximize the amount of fraudulent billing they could submit to GEICO and other automobile insurers.

**6.    The Fraudulent Charges for Fluoroscopic Guidance and Epidurography**

407.   In order to maximize their fraudulent charges for the medically unnecessary pain management injections they purported to provide to GEICO Insureds, Zaitsev, Weissman, Gorman, Interstate, and Highland frequently submitted separate charges for fluoroscopic guidance and epidurography that supposedly was necessary to perform the injections.

408.   As set forth in Exhibits "1" and "2", Zaitsev, Weissman, Gorman, Interstate, and Highland submitted their charges for epidurography under CPT code 72275, typically resulting in a charge  of $1,600.00 for each instance when the epidurography supposedly was provided.

409.   As set forth in Exhibits "1" and "2", Zaitsev, Weissman, Gorman, Interstate, and Highland submitted their charges for fluoroscopic guidance under CPT code 77003, typically resulting in a charge of $950.00 for each instance when the fluoroscopic guidance supposedly was provided.

410.   Like the Defendants' charges for the other Fraudulent Services, the charges for the epidurography and fluoroscopic guidance were fraudulent in that the epidurography and fluoroscopic guidance were medically unnecessary and were performed – to the extent that they

133

were performed at all – pursuant to the Defendants' pre–determined fraudulent treatment, referral, and billing protocol, not to treat or otherwise benefit the Insureds.

411.    What is more, and like he Defendants' charges for the other Fraudulent Services, the charges for the epidurography and fluoroscopic guidance were fraudulent in that they misrepresented Interstate and Highland's eligibility to collect PIP Benefits in the first instance.

412.    What is more, in order to further increase their fraudulent billing for the pain management injections, Zaitsev, Weissman, Gorman, Interstate, and Highland frequently and fraudulently unbundled their fluoroscopic guidance charges from the underlying charges for epidurography.

413.    Epidurography involves the injection of contrast dye under fluoroscopic guidance into the epidural space.

414.    Pursuant to the CPT Assistant, if epidurography is performed and billed under CPT code 72275, fluoroscopic guidance is considered to be included in the epidurography charges under CPT code 72275, and may not be billed separately under CPT code 77003.

415.    As a result, healthcare services providers are not entitled to be reimbursed separately for fluoroscopic guidance under CPT code 77003 when billing for epidurography under CPT code 72275.

416.    Even so, and as set forth in Exhibits "1" and "2", Zaitsev, Weissman, Gorman, Interstate, and Highland routinely unbundled billing for fluoroscopic guidance under CPT code 77003 from the underlying epidurography charges under CPT code 72275 so as to maximize the amount of fraudulent billing they could submit to GEICO.

417.    For example:

(i)    Weissman, Zaitsev, and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named DA on April 17, 2013;

(ii)   Weissman, Zaitsev, and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SD on April 17, 2013;

(iii)  Gorman, Zaitsev, and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named MD on May 29, 2013;

(iv)   Zaitsev and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named MB on July 10, 2013;

(v)    Zaitsev and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named JA on July 31, 2013;

(vi)   Zaitsev and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named RH on September 4, 2013;

(vii)  Weissman, Zaitsev, and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named NC on October 2, 2013;

(viii) Gorman, Zaitsev, and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SJ on November 13, 2013;

(ix)   Zaitsev and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named AC on December 11, 2013;

(x)    Weissman, Zaitsev, and Highland billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named MC on March 12, 2014;

(xi)   Zaitsev and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named CC on April 16, 2014;

(xii)   Gorman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named MG on April 23, 2014;

(xiii)  Weissman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named AA on May 7, 2014;

(xiv)   Gorman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named LL on June 4, 2014;

(xv)    Gorman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named JM on June 4, 2014;

(xvi)   Gorman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named KD on June 25, 2014;

(xvii)  Weissman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named DL on June 25, 2014;

(xviii) Gorman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named CC on August 6, 2014;

(xix)   Gorman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named DC on October 15, 2014; and

(xx)    Weissman, Zaitsev, and Interstate billed GEICO for fluoroscopic guidance under CPT code 77003 concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named EW on November 5, 2014.

418.   Each such charge constituted a separate violation of N.J.S.A. § 39:6A–4.6 and

N.J.A.C. 11:3–29.6.

## G.   The Fraudulent Billing Through Interstate for Services That Were Unlawfully Provided in New York

419.   Not only did the Defendants bill for medically unnecessary, illusory, and

otherwise non-compensable services, but Interstate, Zaitsev, Weissman, Ciccone, and Gorman

routinely falsely represented that Interstate was eligible to collect PIP Benefits in connection with services that purportedly were provided in New York.

420.    As set forth above, Interstate is a New Jersey medical professional corporation, not a New York medical professional corporation.

421.    As set forth above, healthcare providers that fail to comply with pertinent statutory and regulatory requirements are not eligible to collect PIP Benefits, whether or not the underlying services were medically necessary and actually performed.

422.    Pursuant to the New York Education Law, medical professional corporations operating in New York must have a certificate of authority from the New York Department of Education, and must be properly incorporated in New York. See, e.g., N.Y. Educ. Law §§ 6509, 6530; N.Y. Bus. Corp. Law §§ 1503, 1514.

423.    Upon information and belief, Interstate never obtained a certificate of authority from the New York Department of Education, and never was incorporated in New York.

424.    For instance, the New York Department of State Division of Corporations website indicates that Interstate never was incorporated in New York or authorized to do business in New York.

425.    Likewise, the New York Education Department's Office of the Professions website indicates that Interstate never received any certificate of authority from the New York Education Department.

426.    Even so, in the claims identified in Exhibit "1", Interstate, Zaitsev, Weissman, Ciccone, and Gorman routinely billed GEICO through Interstate for examinations, EDX testing, pain management injections, and computerized range of motion and muscle tests that purportedly were conducted in New York.

427.    For example:

(i)     Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on August 24, 2015 to an Insured named JD at 3077 Hyland Boulevard in Staten Island, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(ii)    Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on September 21, 2015 to an Insured named JH at 3077 Hyland Boulevard in Staten Island, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(iii)   Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on September 24, 2015 to an Insured named NF at 2309 Arthur Avenue in the Bronx, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination

(iv)    Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on October 5, 2015 to an Insured named HB at 2309 Arthur Avenue in the Bronx, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(v)     Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on October 26, 2015 to an Insured named VG at 3077 Hyland Boulevard in Staten Island, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(vi)    Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on November 2, 2015 to an Insured named ER at 6370 Woodhaven Boulevard in Rego Park, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(vii)   Interstate, Zaitsev, and Weissman billed GEICO for an examination that Weissman purportedly provided on November 23, 2015 to an Insured named JA at 3077 Hyland Boulevard in Staten Island, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(viii)  Interstate, Zaitsev, and Gorman billed GEICO for an examination that Gorman purportedly provided on November 23, 2015 to an Insured named GS at 131-10 Liberty Avenue in South Richmond Hill, New York, despite the fact that

Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(ix)     Interstate, Zaitsev, and Ciccone billed GEICO for EDX tests that Ciccone purportedly provided on January 5, 2016 to an Insured named JO at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative EDX tests.

(x)      Interstate, Zaitsev, and Ciccone billed GEICO for EDX tests that Ciccone purportedly provided on January 6, 2016 to an Insured named SA at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative EDX tests.

(xi)     Interstate, Zaitsev, and Ciccone billed GEICO for EDX tests that Ciccone purportedly provided on January 7, 2016 to an Insured named MN at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative EDX tests.

(xii)    Interstate, Zaitsev, and Ciccone billed GEICO for pain management injections that Ciccone purportedly provided on January 14, 2016 to an Insured named GP at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative injections.

(xiii)   Interstate, Zaitsev, and Ciccone billed GEICO for pain management injections that Ciccone purportedly provided on February 2, 2016 to an Insured named CC at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative injections.

(xiv)    Interstate, Zaitsev, and Ciccone billed GEICO for EDX tests that Ciccone purportedly provided on February 3, 2016 to an Insured named MM at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative EDX tests.

(xv)     Interstate, Zaitsev, and Ciccone billed GEICO for computerized range of motion and muscle tests that Ciccone purportedly provided on February 3, 2016 to an Insured named FL at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative computerized range of motion and muscle tests.

(xvi)    Interstate, Zaitsev, and Gorman billed GEICO for pain management injections that Gorman purportedly provided on February 8, 2016 to an Insured named PR at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative injections.

(xvii)   Interstate, Zaitsev, and Ciccone billed GEICO for computerized range of motion and muscle tests that Ciccone purportedly provided on February 16, 2016 to an

Insured named DH at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative computerized range of motion and muscle tests.

(xviii)   Interstate, Zaitsev, and Ciccone billed GEICO for EDX tests that Ciccone purportedly provided on February 17, 2016 to an Insured named JO at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative EDX tests.

(xix)   Interstate, Zaitsev, and Gorman billed GEICO for an examination that Gorman purportedly provided on February 18, 2016 to an Insured named RA at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative examination.

(xx)   Interstate, Zaitsev, and Ciccone billed GEICO for computerized range of motion and muscle tests that Ciccone purportedly provided on February 29, 2016 to an Insured named MS at 2818 31st Street in Astoria, New York, despite the fact that Interstate was not eligible to collect PIP Benefits in connection with the putative computerized range of motion and muscle tests.

428.   These are only representative examples. In the claims identified in Exhibit "1", Interstate, Zaitsev, Weissman, Ciccone, and Gorman routinely billed GEICO through Interstate for examinations, EDX testing, pain management injections, and computerized range of motion and muscle tests that unlawfully were performed in New York, to the extent that they were performed at all.

429.   Each such bill falsely represented that Interstate was eligible to receive PIP Benefits in connection with the purported services, when in fact it was not.

**IV.**   **The Fraudulent Billing the Defendants Submitted to GEICO**

430.   To support their fraudulent charges for the claims identified in Exhibits "1" and "2", the Defendants systematically submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports through Interstate and Highland to GEICO encompassing thousands of charges for the Fraudulent Services for which the Defendants were not entitled to receive payment.

431.    As described above, the HCFA-1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Interstate and Highland were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Interstate and Highland were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Zaitsev, Interstate, and Highland were engaged in an illegal kickback scheme; (b) they purported to provide, and billed for, the medically unnecessary and illusory Fraudulent Services; (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services; (d) they were engaged in an illegal self-referral scheme; and (e) with respect to Interstate's billing for services allegedly provided in New York, because Interstate lacked the certificate of authority necessary to provide such services in New York.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an illegal kickback scheme; (b) they were medically unnecessary and, in many cases, illusory; (c) they were provided pursuant to an illegal self-referral scheme; (d) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c); and (e) with respect to Interstate's billing for services allegedly provided in New York, because Interstate lacked the certificate of authority necessary to provide such services in New York.

(iii)    The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented and exaggerated the level of the

Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

**V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

432.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

433.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

434.    Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants were engaged in kickbacks and illegal self-referrals.

435.    What is more, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly are subjected to them.

436.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

437.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitration and litigation against GEICO and other insurers if the charges were not promptly paid in full.

438.     GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,160,000.00 based upon the fraudulent charges representing payments made by GEICO to Interstate and Highland.

439.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Interstate and Highland
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

440.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 439 above.

441.     There is an actual case in controversy between GEICO and Interstate and Highland regarding more than $75,000.00 in pending fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

442.     Interstate and Highland have no right to receive payment for any pending bills submitted to GEICO because Interstate and Highland were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice.

443.     Interstate and Highland have no right to receive payment for any pending bills submitted to GEICO because the underlying services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice.

444.     Interstate and Highland have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

445.     Interstate and Highland have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services frequently never were performed at all.

446.     Interstate and Highland have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

447.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Interstate and Highland have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

448.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 447 above.

449.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that they were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, they were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Zaitsev and Interstate were engaged in an illegal kickback scheme; (b) they purported to provide, and billed for, the medically unnecessary and illusory Fraudulent Services; (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services; (d) they were engaged in an illegal self-referral scheme; and (e) with respect to Interstate's billing for services allegedly provided in New York, because Interstate lacked the certificate of authority necessary to provide such services in New York.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to Zaitsev and Interstate's illegal kickback scheme; (b) they were medically unnecessary and, in many cases, illusory; (c) they were provided pursuant to an illegal self-referral scheme; (d) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c); and (e) with respect to Interstate's billing for services allegedly provided in New York, because Interstate lacked the certificate of authority necessary to provide such services in New York.

(iii)    The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

145

450.    The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A . 17:33-A-7.

451.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,570,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRD CAUSE OF ACTION
**Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

452.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 451 above.

453.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that they were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, they were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Zaitsev and Highland were engaged in an illegal kickback scheme; (b) they purported to provide, and billed for, the medically unnecessary and illusory Fraudulent Services; (c) they routinely violated N.J.S.A. § 39:6A-4.6(c) by inflating and unbundling their charges for the Fraudulent Services; and (d) they were engaged in an illegal self-referral scheme.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent

Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to Zaitsev and Highland's illegal kickback scheme; (b) they were medically unnecessary and, in many cases, illusory; (c) they were provided pursuant to an illegal self-referral scheme; and (d) they routinely were billed in violation of N.J.S.A. § 39:6A-4.6(c).

(iii)   The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

454.   The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A . 17:33-A-7.

455.   As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $590,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### FOURTH CAUSE OF ACTION
**Against Zaitsev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

456.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 455 above.

457.    Interstate is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

458.    Zaitsev has knowingly conducted and/or participated, directly or indirectly, in the conduct of Interstate's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three and half years seeking payments that Interstate was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal self-referral scheme; (vi) Zaitsev and Interstate were engaged in an illegal kickback scheme; and (vii) neither Interstate nor the underlying services were in compliance with the applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

459.    Interstate's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev has operated Interstate, inasmuch as Interstate is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Interstate to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Interstate to the present day.

460.    Interstate is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Interstate in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

461.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,570,000.00 pursuant to the fraudulent bills submitted through Interstate.

462.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

463.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 462 above.

464.    Interstate is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

465.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland are employed by and/or associated with the Interstate enterprise.

466.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland knowingly have agreed, combined, and conspired to conduct and/or participate, directly or

indirectly, in the conduct of the Interstate enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than three and a half years seeking payments that Interstate was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal self-referral scheme;  (vi) Zaitsev and Interstate were engaged in an illegal kickback scheme; and (vii) neither Interstate nor the underlying services were in compliance with the  law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

467.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

468.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,570,000.00 pursuant to the fraudulent bills submitted through Interstate.

469.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate**
**(Common Law Fraud)**

470.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 469 above.

471.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

472.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims identified in Exhibit "1", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that Interstate was in compliance with the laws and regulations governing healthcare practice, and was eligible to receive PIP Benefits, when in fact it was not; (iv) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice in New Jersey, and were eligible for PIP reimbursement, when in fact they were not.

473.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate intentionally made the above-described false and fraudulent statements and concealed

material facts in a calculated effort to induce GEICO to pay charges submitted through Interstate that were not compensable under New Jersey's No-Fault Laws.

474.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,570,000.00 pursuant to the fraudulent bills submitted by Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate through Interstate.

475.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

476.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland**
**(Aiding and Abetting Fraud)**

477.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 476 above.

478.    Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Interstate and Zaitsev. The acts of Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland in furtherance of the fraudulent scheme include knowingly performing many of the Fraudulent Services in exchange for compensation from Interstate and Zaitsev, despite the lack of any medical reason for the Fraudulent Services.

479.    The conduct of Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland in furtherance of the fraudulent scheme was significant and material. The conduct of Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland was a necessary part of and was critical to the success of the fraudulent scheme because without his actions, including performing many of the Fraudulent Services, there would be no opportunity for Interstate and Zaitsev to obtain payment from GEICO and from other insurers.

480.    Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Interstate and Zaitsev for unreimburseable and medically unnecessary Fraudulent Services, because he sought to continue profiting through the fraudulent scheme.

481.    The conduct of Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland caused GEICO to pay more than $2,570,000.00 pursuant to the fraudulent bills submitted by the Defendants through Interstate.

482.    Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, and Copeland's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

483.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate
### (Unjust Enrichment)

484.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 483 above.

485.   As set forth above, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

486.   When GEICO paid the bills and charges submitted or caused to be submitted by Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Interstate, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate's improper, unlawful, and/or unjust acts.

487.   Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

488.   Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

489.   By reason of the above, Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,570,000.00.

### NINTH CAUSE OF ACTION
**Against Zaitsev**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

490.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 489 above.

491.     Highland is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

492.     Zaitsev has knowingly conducted and/or participated, directly or indirectly, in the conduct of Highland's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two and half years seeking payments that Highland was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal self-referral scheme; (vi) Zaitsev and Highland were engaged in an illegal kickback scheme; and (vii) neither Highland nor the underlying services were in compliance with the law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

493.     Highland's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zaitsev has operated Highland, inasmuch as Highland is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Highland to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Highland to the present day.

494.    Highland is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Highland in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

495.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $590,000.00 pursuant to the fraudulent bills submitted through Highland.

496.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Zaitsev, Weissman, Ciccone, Gorman, and Reiter
### (Violation of RICO, 18 U.S.C. § 1962(d))

497.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 496 above.

498.    Highland is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

499.    Zaitsev, Weissman, Ciccone, Gorman, and Reiter are employed by and/or associated with the Highland enterprise.

500.    Zaitsev, Weissman, Ciccone, Gorman, and Reiter knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of

the Highland enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two and a half years seeking payments that Highland was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal self-referral scheme; (vi) Zaitsev and Highland were engaged in an illegal kickback scheme; and (vii) neither Highland nor the underlying services were in compliance with the law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

501.    Zaitsev, Weissman, Ciccone, Gorman, and Reiter knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

502.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $590,000.00 pursuant to the fraudulent bills submitted through Highland.

503.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland**
**(Common Law Fraud)**

504.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 503 above.

505.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for the Fraudulent Services.

506.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims identified in Exhibit "2", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; (iii) in every claim identified in Exhibit "2", the representation that Highland was in compliance with the laws and regulations governing healthcare practice, and was eligible to receive PIP Benefits, when in fact it was not; (iv) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

507.    Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated

158

effort to induce GEICO to pay charges submitted through Highland that were not compensable under New Jersey's No-Fault Laws.

508.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $590,000.00 pursuant to the fraudulent bills submitted by Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland through Highland.

509.     Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

510.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Weissman, Ciccone, Gorman, and Reiter
### (Aiding and Abetting Fraud)

511.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 510 above.

512.     Weissman, Ciccone, Gorman, and Reiter knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Highland and Zaitsev. The acts of Weissman, Ciccone, Gorman, and Reiter in furtherance of the fraudulent scheme include knowingly performing many of the Fraudulent Services in exchange for compensation from Highland and Zaitsev, despite the lack of any medical reason for the Fraudulent Services.

513.    The conduct of Weissman, Ciccone, Gorman, and Reiter in furtherance of the fraudulent scheme was significant and material. The conduct of Weissman, Ciccone, Gorman, and Reiter was a necessary part of and was critical to the success of the fraudulent scheme because without his actions, including performing many of the Fraudulent Services, there would be no opportunity for Highland and Zaitsev to obtain payment from GEICO and from other insurers.

514.    Weissman, Ciccone, Gorman, and Reiter aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Highland and Zaitsev for unreimburseable and medically unnecessary Fraudulent Services, because he sought to continue profiting through the fraudulent scheme.

515.    The conduct of Weissman, Ciccone, Gorman, and Reiter caused GEICO to pay more than $590,000.00 pursuant to the fraudulent bills submitted by the Defendants through Highland.

516.    Weissman, Ciccone, Gorman, and Reiter's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

517.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland**
**(Unjust Enrichment)**

518.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 517 above.

519.   As set forth above, Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

520.   When GEICO paid the bills and charges submitted or caused to be submitted by Highland and Zaitsev for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland's improper, unlawful, and/or unjust acts.

521.   Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

522.   Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

523.   By reason of the above, Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland have been unjustly enriched in an amount to be determined at trial, but in no event less than $590,000.00.

## JURY DEMAND

524.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against Interstate and Highland, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Interstate and

Highland have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,570,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.      On the Third Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $590,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

D.      On the Fourth Cause of Action against Zaitsev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,570,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, and Lundberg, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,570,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate, compensatory damages in favor of GEICO an

amount to be determined at trial but in excess of $2,570,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Weissman, Ciccone, Gorman, Reiter, Lynch, and Lundberg , compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,570,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

H.      On the Eighth Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, Reiter, Lynch, Lundberg, Copeland, and Interstate, more than $2,570,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

I.      On the Ninth Cause of Action against Zaitsev, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $590,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, and Reiter, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $590,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.      On the Eleventh Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, Reiter, and Highland, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $590,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against Weissman, Ciccone, and Reiter, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$590,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

M.      On the Thirteenth Cause of Action against Zaitsev, Weissman, Ciccone, Gorman, and Reiter, more than $590,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:   Hackensack, New Jersey
         August 3, 2017

                           RIVKIN RADLER LLP

                           By: _____
                               John Robertelli, Esq.
                               Gene Y. Kang, Esq.
                               Barry I. Levy, Esq. (to be admitted *pro hac vice*)
                               Max Gershenoff, Esq. (to be  admitted *pro hac vice*)
                               Steven Henesy, Esq. (to be admitted *pro hac vice*)
                               21 Main Street, Suite 158
                               Court Plaza South, West Wing
                               Hackensack, New Jersey 07601
                               (201) 287–2460